967 P.2d 702

STATE of Idaho, Plaintiff–Respondent,

v.

James E. WOOD, Defendant–Appellant.

Nos. 21057, 22375.

Supreme Court of Idaho,
Boise, December 1996 Term.

Oct. 9, 1998.

Kehne & Adams Law Office, Boise, for appellant. Rolf M. Kehne argued.

Hon. Alan G. Lance, Attorney General; Lynn E. Thomas, Deputy Attorney General, Boise, for respondent. Lynn E. Thomas argued.

## ON DENIAL OF REHEARING.

Substitute Opinion The Court's Prior Opinion Dated June 19, 1998, is Hereby Withdrawn.

SCHROEDER, Justice.

This is an appeal of a death sentence imposed upon James Edward Wood on a plea of guilty for the murder of Jeralee Underwood, an eleven-year-old girl. Following imposition of the death sentence, Wood filed a petition for post-conviction relief which was denied. Wood appeals the dismissal of his petition for post-conviction relief.

## I.

## BACKGROUND

Jeralee Underwood (Jeralee) resided in Pocatello, Idaho with her family. On June 29, 1993, James Wood (Wood) was visiting the home of a customer on Jeralee's paper route when she came by to make a collection. Wood followed Jeralee when she left, detained her with a false story, and forced her into his automobile. Wood held Jeralee captive for over a day, during which time he sexually molested her, then shot her in the head with a .22 caliber pistol and hid her body by covering it with brush. According to the findings of the district court, later

"Wood returned to the site of the murder, undressed the corpse, and mutilated the body by removing the sex organs and severing the arms, head, and legs. He threw the clothing and body parts into the Snake River. The body was later recovered, with the exception of the right hand and right calf."

## II.

### PRIOR PROCEEDINGS

#### A. Pre–Trial Proceedings

On July 6, 1993, Wood was arrested and charged with kidnapping Jeralee Underwood. After hours of interrogation by Police Detective Shaw, he confessed to the kidnapping, attempted rape and murder of Jeralee. Wood also confessed to raping other local girls, to committing several robberies and other killings, and to an attempted murder.

On July 7, 1993, Wood was arraigned and the law firm of Whittier, McDougall, Souza, Murray and Clark was appointed as public defender. A preliminary hearing on the kidnapping charge was set for July 16, 1993. However, on July 12, 1993, an Amended Complaint was filed charging Wood with twelve felonies, including the first-degree murder and kidnapping of Jeralee and several other kidnappings, rapes, and armed robberies. The public defender was also appointed to represent Wood on the Amended Complaint. On that date the public defender filed and served motions for discovery, for continuance of the preliminary hearing, and a waiver of statutory time. This was the public defender's first appearance for Wood and Monte Whittier (Whittier) served as lead counsel.

On August 9, 1993, Whittier filed a Motion to Limit Visitation which was intended to restrict media contact with Wood as he made statements to members of the press that were detrimental to his defense. The motion was granted and an order issued providing that representatives of the media would only be allowed to phone or visit Wood with the prior approval of Whittier. The Sheriff refused to honor Whittier's request to remove a telephone from Wood's cell which Wood used to call members of the press despite Whittier's efforts to persuade him not to speak to the media.

While Wood awaited arraignment, Whittier drafted a three-page contract for Wood's signature for the rights to write a book about Wood and to obtain movie rights. Whittier did not sign the contract and testified that the contract was a hoax. Whittier testified that the contract was a ruse to get Wood to stop talking to the media. At approximately the same time, Whittier organized a press conference at which Wood gave a televised confession to the murder of Jeralee and to other serious charged and uncharged crimes.

Wood waived a preliminary hearing and was bound over to the district court. Wood was arraigned on August 31, 1993, in district court and entered pleas of not guilty to all counts alleged in the Information. A jury trial was set for December 7, 1993. The district court granted defense motions for an investigator and psychiatric examination. Hearings on other defense motions were set for September 14, 1993.

On September 13 or 14, Whittier tape recorded a conversation he had with Wood concerning his plea. In that conversation Wood indicated he wished to change his plea to guilty but said he wanted to have the psychiatric examination completed in order to determine his competency to aid in his own defense before he pled guilty. During this conversation, Whittier told Wood that he represented to the court and prosecution that Wood was competent.

Following a recess at the September 14 hearing and prior to the completion of the psychiatric evaluation, Wood returned to court, withdrew his prior pleas of not guilty and entered guilty pleas to one count of first-degree murder, one count of first-degree kidnapping, and two counts of rape. The remaining charges were dismissed without prejudice. The district court accepted the guilty pleas. The court ordered a presentence investigation (PSI) and ordered that the report of defense's psychiatric expert, Dr. Vicky Gregory, be included in the PSI. Whittier did not object.

A sentencing hearing was held on December 7, 1993, during which Whittier presented

no mitigating evidence, but Dr. Gregory testified in aggravation for the prosecution. On January 13, 1994, the court issued its decision on the defense's objections to the information in the presentence report, which did not include an objection to the admission of Dr. Gregory's report. On January 14, 1994, the district court issued its findings concerning consideration of the death penalty and sentenced Wood to death for the murder of Jeralee. The court also imposed consecutive terms of fixed life on each of the kidnapping and rapes to which Wood had pled guilty.

On January 16, 1994, Whittier appealed the sentence of death.

## B. Post–Conviction Proceedings

On February 7, 1994, Whittier filed a Petition for Post–Conviction Relief, alleging that Wood's death sentence was unconstitutional for reasons related to felony murder. On February 25, 1994, Whittier filed a motion to dismiss the notice of appeal. This Court ordered that ruling on the motion to dismiss the appeal would be reserved and appeal proceedings suspended. The matter was remanded to the district court for a determination of whether Wood was competent to dismiss his appeal.

Subsequently, the motion to dismiss the appeal was withdrawn, Whittier withdrew as counsel for Wood and current counsel was appointed. Counsel filed an Amended Petition for Post–Conviction Relief on June 20, 1994. Several depositions were taken, and extensions were granted as post-conviction counsel continued to investigate and prepare. At one point the district court eventually denied any further extensions and commenced the post-conviction review trial.

The district judge denied all relief in the post-conviction proceeding. Wood appealed this decision.

## III.

## WOOD HAS NOT ESTABLISHED THAT JUDGE WINMILL SHOULD HAVE REFUSED TO SIT ON THE CRIMINAL CASE.

Wood argues that Judge Winmill should have recused himself without motion from either party on the basis that he had close ties to the victims, the lead investigator and other participants in the case. Wood points to the fact that Detective Shaw, the victim and her family, and two of the lawyers in the firm appointed to represent Wood all attended the same church and that the judge saw the victim's father on a regular basis. Further, the judge was required to assess the credibility of several of his fellow church members. In addition, he was required to rule on the admissibility of evidence concerning a purported church doctrine offered to impeach members of the church who claimed that they had never heard of "blood atonement."

## A. Standard of Review

■■■ The State asserts that "[w]hen issues on appeal are not supported by propositions of law, authority, or argument, they will not be considered." *State v. Zichko,* 129 Idaho 259, 263, 923 P.2d 966, 970 ( 1996). "A party waives an issue cited on appeal if either authority or argument is lacking, not just if both are lacking." *Id.* Wood supports this assignment of error with argument but no authority, and, consequently, the State contends that Wood has waived this issue on appeal. However, section 19-2827 of the Idaho Code (I.C.) imposes an affirmative duty on this Court to review the imposition of the death penalty. In addition, this Court must consider possible errors in sentencing that are not raised by the defendant or were not objected to at his trial. *State v. Osborn,* 102 Idaho 405, 631 P.2d 187 (1981). In *Osborn,* this Court stated:

> [The] general rule applicable to appellate review of error is not necessarily controlling where we are statutorily required to undertake appellate review irrespective of the defendant's contentions, if any. Death is clearly a different kind of punishment from any other that may be imposed, and I.C. § 19-2827 mandates that we examine not only the sentence but the procedure followed in imposing that sentence regardless of whether an appeal is even taken. This indicates to us that we may not ignore unchallenged errors. Moreover, the gravi-

ty of a sentence of death and the infrequency with which it is imposed outweighs any rationale that might be proposed to justify refusal to consider errors not objected to below.

*Id.* at 410–11, 631 P.2d at 192–93. Consequently, the Court will consider Wood's claim.

**B. Judge Winmill did not Abuse his Discretion in Hearing Wood's Case**

 Although Wood's trial counsel did not move to disqualify Judge Winmill at trial, this Court must still determine if Judge Winmill had an affirmative duty to recuse himself because of his affiliations with the Underwoods and their mutual church membership. The Code of Judicial Conduct, originally adopted by this Court on September 27, 1976, provides: "Judges should disqualify themselves in proceedings in which impartiality might reasonably be questioned or where personal knowledge of disputed evidentiary facts might reasonably affect their impartiality in the proceeding." CODE OF JUDICIAL CONDUCT Canon 3(C)(1). "Whether a judge's involvement in a case reaches a point where disqualification from further participation in a defendant's case becomes necessary is left to the sound discretion of the judge himself." *Sivak v. State*, 112 Idaho 197, 206, 731 P.2d 192, 201 (1986). There is no indication Judge Winmill had "personal knowledge of disputed evidentiary facts." Therefore, the question is whether Judge Winmill placed himself in a position in which his "impartiality might reasonably be questioned" in sitting on this case.

 "A judge does not have an affirmative duty to withdraw from cases which merely tangentially relate to the judge's participation in an organization or committee." *State v. Knowlton*, 123 Idaho 916, 920, 854 P.2d 259, 263 (1993). The same rule applies to a judge's involvement with a religious organization. It is inevitable that many judges will have church affiliations and that there will be occasions in which they are called upon to decide matters related to members of the same church. Church affiliation alone is not a reasonable basis for questioning a judge's impartiality. Judge

Winmill did not abuse his discretion in hearing the case.

## IV.

## CLAIMS OF INEFFECTIVE ASSISTANCE OF COUNSEL

 Article I, § 13 of the Idaho Constitution assures criminal defendants of "reasonably competent assistance of counsel." *Gibson v. State*, 110 Idaho 631, 635, 718 P.2d 283, 287 (1986). Under a state constitutional analysis, a defendant must establish "that the conduct of counsel contributed to the conviction or to the sentence imposed" to successfully assert a claim of ineffective assistance of counsel. *Aragon v. State*, 114 Idaho 758, 761, 760 P.2d 1174, 1177 (1988) (quoting *State v. Tucker*, 97 Idaho 4, 12, 539 P.2d 556, 564 (1975)). On review, however, it is presumed that trial counsel was competent and that trial tactics were based on sound legal strategy. *Id. Aragon* noted that the Idaho Constitution can be read to afford a broader right to effective assistance of counsel than does the federal constitution, but did not define any difference between the rights afforded under the state and federal constitutions. *Id.*

 The standard for evaluating a claim of ineffective assistance of counsel was set forth by the U.S. Supreme Court in *Cuyler v. Sullivan*, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980), and in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Subsequent to *Aragon*, Idaho explicitly adopted this standard. *Giles v. State*, 125 Idaho 921, 924, 877 P.2d 365, 368 (1994), *cert. denied*, 513 U.S. 1130, 115 S.Ct. 942, 130 L.Ed.2d 886 (1995). "[C]ounsel's performance must have been so incompetent that the trial can not be relied upon as having produced a just result. It is for the accused to show that counsel made serious errors and that the errors resulted in actual prejudice." *Id.* (citing *Strickland*, 466 U.S. at 686, 104 S.Ct. 2052). The two tests which must be met in order to be entitled to relief are: (1) a showing that counsel's performance fell below an objective standard of reasonableness, and (2) a showing that, but

for counsel's errors, the result of the proceedings would have been different. *State v. Charboneau,* 116 Idaho 129, 137, 774 P.2d 299, 309 (1989), *overruled on other grounds by State v. Card,* 121 Idaho 425, 432, 825 P.2d 1081, 1088 (1991).

■ An appellate court reviews the district court's factual findings to determine whether they were clearly erroneous. *Huck v. State,* 124 Idaho 155, 857 P.2d 634 (Ct.App. 1993). The reviewing court, however, exercises free and independent review of the district court's application of law. *Id.* at 157, 857 P.2d at 636.

## A. Failure to Move to Disqualify Judge Winmill

■ Counsel's decision not to move to disqualify Judge Winmill pursuant to Idaho Criminal Rule 25(a), was based on the belief that Judge Winmill would be less inclined to impose the death penalty than other district judges who might draw the case. That was a rational tactical decision that will not be second-guessed on review. *Giles,* 125 Idaho at 924, 877 P.2d at 368; *State v. Roles,* 122 Idaho 138, 145, 832 P.2d 311, 318 (Ct.App. 1992).

## B. Failure to Move to Suppress Wood's Statements to Detective Shaw

■ Although not specifically listed as an issue on appeal, Wood argues that he was not afforded effective assistance of counsel by reason of Whittier's failure to litigate suppression issues. A review of the proceedings for post-conviction relief indicates that there were two suppression issues raised by Wood: 1) Wood argued that the arrest and search warrants were issued based upon Detective Shaw's affidavit and testimony after a twenty to thirty minute off-the-record discussion between the magistrate, Shaw and the prosecutor, and 2) Wood argued that Whittier should have sought suppression of Wood's confession to Detective Shaw on the basis that he was not given *Miranda* warnings until approximately one hour after his arrest.

The district court determined that Wood did not show a basis to invalidate the arrest warrants and search warrants, finding that probable cause had been shown for their issuance. Whatever was said off the record could neither add nor detract from the conclusion that the record established probable cause. The district court concluded the following:

> This leads ineluctably to the conclusion that Wood has not met his burden of showing that Whittier's conduct fell below an objective standard of reasonableness. This also compels the conclusions that, even if the Court were to find that Whittier's performance was deficient, there was no prejudice which resulted from the failure to file a motion to suppress the warrants.

The district court's findings and conclusions are supported by the record, and there has been nothing submitted by way of argument or authority on appeal that would lead to a different conclusion.

Wood also argues that there should have been a motion to suppress his statements to Detective Shaw. Wood was arrested at approximately 7:30 p.m. and signed a waiver of rights at approximately 8:30 p.m. The district court found that Wood made no incriminating statements until after he had waived his *Miranda* rights and had signed the waiver of rights form. The record supports the district court's conclusion that Wood's statements would not have been suppressed, and there has been nothing submitted on appeal by way of authority or argument that would lead to a different conclusion. Wood has not shown any resulting prejudice from the failure to file a motion to suppress. Consequently, he has not established the claim of ineffective assistance of counsel in this regard.

## C. Facilitation of the Press Conference

■ Whittier arranged for a press conference at which Wood made incriminating statements. Prior to this time Wood had initiated calls to members of the press and had responded to calls from the press despite Whittier's advice to Wood that he should refrain from such communications. Apparently Whittier's thought in arranging for the press conference was that this would demonstrate to Wood that he could not trust the

press to convey the information he wished to give in the manner he desired. Whatever the theory, it was flawed due to the obvious risk involved that Wood might make statements that could be used against him. Counsel's conduct in this regard fell below an objective standard of reasonableness. However, the second element to establish ineffective assistance of counsel is that, but for counsel's errors, the result of the proceedings would have been different. *Charboneau,* 116 Idaho at 137, 774 P.2d at 309. Wood has not met the second element.

Wood had already confessed to Detective Shaw. Both the district court and this Court have ruled that Wood has shown no basis to suppress that confession. Also, contrary to counsel's advice, Wood had already admitted to members of the press that he killed Jeralee. Whittier's tactic was ill-advised, but it was apparently born of desperation to control a client who was uncontrollable. Once again, tactical decisions will not be second-guessed on review. *Giles,* 125 Idaho at 924, 877 P.2d at 368.

**D. Waiver of the Preliminary Hearing**

 Wood argues that it was ineffective assistance of counsel to waive the preliminary hearing without obtaining concessions from the prosecution. There is no showing as to what Wood might have obtained as a concession. As the district court determined, Wood wanted to waive the preliminary hearing. He did not want to force the Underwoods to testify, and he did not want his conduct with Jeralee's body post-mortem to become public. There is no showing that counsel's performance fell below an objective standard of reasonableness or that the result of the proceeding would have been different if a preliminary hearing had been held. Waiver of the preliminary hearing did not constitute ineffective assistance of counsel.

**E. Entry of Guilty Plea**

 The district court determined that Wood wanted to plead guilty. That was his decision to make. There is evidence that Wood would have preferred to have the psychological evaluation completed before entering the plea, but he elected to proceed before that time. The record is clear that had the psychological evaluation indicated that he was not competent to aid in his own defense, the plea could have been withdrawn. There is no indication in the psychological evaluation that he was not competent to aid in his own defense. There is no evidence that delaying the plea would have had any effect upon the outcome. Wood was insistent upon pleading guilty. There is no basis to find that Whittier could have prevented Wood from pleading guilty. Delay would not have changed the outcome.

**F. Failure to Present Mitigating Evidence**

 Whittier did not present mitigating evidence at the sentencing hearing. The district court noted that Whittier's efforts were minimal, that he did not employ a mitigation specialist or attempt a detailed investigation on his own. The district court also observed that no evidence was presented at the post-conviction review proceeding identifying mitigating evidence. There was nothing submitted to the district court or to this Court that identifies any mitigating evidence that might have changed the outcome of these proceedings. Wood has not shown ineffective assistance of counsel in this claim.

**G. Failure to Object to the District Court's Use of Dr. Gregory's Report**

The district court determined that it would use Dr. Gregory's report in considering what sentence Wood was to receive. Whittier did not object to this, despite the fact that the report had not been completed and its contents could not be known. Subsequently, the prosecution called Dr. Gregory as a witness in aggravation. Again, this was done without objection from Whittier. This Court finds that Whittier's failure to object was ineffective assistance of counsel and will more fully explain our reasoning below in part VII of this opinion.

**H. Motion to Dismiss the Appeal Without Wood's Consent**

 Whittier moved to dismiss the appeal without Wood's consent. Whittier claims he did this in order to obtain appoint-

ment of other counsel for Wood. There are more appropriate methods to obtain this result, such as a motion to withdraw. Proceeding by a motion to dismiss the appeal falls below an objective standard of reasonableness, since it jeopardized Wood's rights. However, it is clear that this action did not affect the outcome of the proceedings. The present appeal preserves all rights which Wood might have. Wood lost nothing as a consequence of the motion to dismiss the appeal.

## V.

## CONFLICT OF INTEREST

### A. Wood Failed to Establish Whittier had a Conflict of Interest Such that He was Denied Effective Assistance of Counsel

Wood maintains that Whittier had conflicts of interest which precluded him from providing effective representation. Those purported conflicts consist of: (1) associations with the Underwood family by other members of the public defender's firm, (2) Whittier's personally held religious beliefs that allegedly conflicted with his representation of Wood, and (3) an alleged financial interest created by the book and movie contract which Whittier drafted for Wood.

 Prejudice to a criminal defendant is presumed "only if the defendant demonstrates that counsel 'actively represented conflicting interests' and that 'an actual conflict of interest adversely affected his lawyer's performance.'" *Burger v. Kemp,* 483 U.S. 776, 783, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987) (quoting *Strickland,* 466 U.S. at 692, 104 S.Ct. 2052). Wood bears the burden of showing "active representation of competing interests" in order to establish a conflict of interest implicating the protection of the Sixth Amendment. *Id.* In addition to showing an active representation of competing interests, a defendant must show that an actual conflict adversely affected counsel's performance. *Holloway v. Arkansas,* 435 U.S. 475, 482, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978).

The Idaho Rules of Professional Conduct set forth the standards for conflicts of interest. Rule 1.7 states, in relevant part:

(b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:

(1) the lawyer reasonably believes the representation will not be adversely affected; and

(2) the client consents after consultation.

I.R.P.C. 1.7.

### 1. Relationships Between Members of Whittier's Firm and the Underwood Family

 Wood argues that certain facts show a close relationship existed between two members of Whittier's firm (Bryan Murray and John Souza) and the Underwood family. Those facts include that:

(1) Murray was Underwood's spiritual leader until five or six months before Jeralee was abducted;

(2) Murray saw the Underwoods at least one time, if not three to four times, per week for years;

(3) Mrs. Murray provided comfort and meals to the Underwood family after the abduction;

(4) Murray participated in a search team to find Jeralee;

(5) Murray and Souza were at the police station while Wood was being interrogated for the purpose of assisting the Chief of Police in breaking the news of Jeralee's death to the Underwoods;

(6) In his own words, Murray "strongly expressed the view that the firm should have nothing to do with representing Mr. Wood" because Murray "was very close to the Underwood family;"

(7) At the onset of the representation of Wood, Murray offered condolences and emotional support to the Underwood family; and

(8) Both Murray and Souza have been consulted by Mr. Underwood in their roles as lawyers.

"While lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rule 1.7, 1.8(c), 1.9 or 2.2." I.R.C.P. 1.10.

Two members of the public defender's firm had personal associations with the Underwood family. However, Murray's and Souza's belief that they should not represent Wood was based on personally held beliefs, not preclusive conflicts of interest as set forth in I.R.C.P. 1.7, 1.8(c), 1.9, or 2.2. Wood has failed to show that any personal associations with the Underwoods by members of the firm who did not participate in the defense of this case affected Whittier's representation of Wood.

### 2. Book and Movie Rights Contract

■ Whittier's preparation of a book and movie rights contract for Wood's signature raises the question of whether Whittier had a financial interest in the case which created a conflict of interest resulting in ineffective assistance of counsel. Whittier did not sign the contract and testified that he did not intend to actually obtain any rights through the contract. Apparently this was another unusual tactic to attempt to control an uncontrollable client. Whittier apparently thought that Wood would not be as willing to diminish the value of a story that might be sold by talking to members of the press. The district court noted the ethical issues presented by this tactic but correctly focused on whether Whittier had an actual conflict of interest, and, if so, if the conflict adversely affected his performance. *Holloway*, 435 U.S. at 482, 98 S.Ct. 1173.

The district court found that Whittier never signed the contract and had no intention of acquiring any rights under the contract. Consequently, he never actively represented any interest adverse to that of Wood. These findings and the conclusion of the district court are supported by the evidence submitted in the post-conviction review proceedings.

The district court determined that the existence of the purported contract did not influence the defense strategy. In fact Whittier conducted the defense in a manner to diminish "the glare of publicity which surrounded this case." There was no effort by Whittier to sensationalize the case and thereby increase the value of any book or movie rights. The record supports these findings.

The district court concluded "that no actual conflict of interest existed with regard to the book/movie contract, and that, in any event, Whittier's representation of Wood was not adversely affected by the existence of any such contract." These determinations are supported by the record. Wood has not shown that his right to effective assistance of counsel was violated.

### 3. Whittier's Personal Beliefs

Wood has not shown that Whittier had any personal beliefs that constituted a conflict of interest and interfered with his representation.

## VI.

## WOOD'S REQUEST FOR ADDITIONAL FINANCIAL AND EXPERT ASSISTANCE

### A. Failure to Apply for Investigatory and Expert Assistance *Ex Parte*

■ Wood claims that Whittier committed a grievous error when he applied for investigative and expert assistance in open court with notice to the prosecutor. Wood relies upon a statutory procedure in the federal system and a process recognized by some state decisions. *See* 21 U.S.C. § 848(q)(9); 18 U.S.C. § 3006A; *State v. Ballard*, 333 N.C. 515, 428 S.E.2d 178 (N.C. 1993).

Wood argues that he should have been permitted to obtain financial and expert assistance without notice to the prosecutor, and that Whittier should have attempted to obtain this assistance through an *ex parte* procedure. Wood claims that the U.S. Supreme Court's rationale in *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), leads to an inevitable conclusion that an *ex parte* procedure for obtaining expert assis-

tance is constitutionally required. The issue dealt with by the U.S. Supreme Court in *Ake* was the state court's denial of a defense motion for a psychiatric evaluation at the state's expense when the defendant's mental state was clearly in issue. The facts and the language used by the Court in *Ake* indicates that Wood's proposed conclusion is not required. The U.S. Supreme Court addressed the issue in these terms:

> Our concern is that the indigent defendant have access to a competent psychiatrist for the purpose we have discussed, and as in the case of the provision of counsel we leave to the States the decision on how to implement this right.

*Ake*, 470 U.S. at 83, 105 S.Ct. 1087.

Idaho Code § 19–852 provides for a right to counsel for indigent persons and a right to the "necessary services and facilities of representation (including investigation and other preparation)." I.C. § 19–852(a)(2). Nothing in this section guarantees an *ex parte* application for the assistance. The fact that the prosecutor knows of the application for such assistance does not deny the defendant due process. Whittier did not provide ineffective assistance of counsel by making the requests for assistance in open court with notice to the prosecutor.

### B. Appointment of an Independent Judge to Rule on Requests for Financial and Expert Assistance

■ Coordinate with the argument that he was entitled to make requests for investigative and expert assistance without notice to the prosecutor, Wood argues that the district court should have appointed a so-called "money judge" to rule on the requests for funding the investigation and to pay experts.

This Court has addressed the process to be followed in granting financial assistance to indigent persons pursuant to I.C. § 19–852(a):

> It is thus incumbent upon the trial court to inquire into the needs of the defendant and the circumstances of the case, and then make a determination of whether an adequate defense will be available to the defendant without the requested expert or investigative aid. If the answer is in the

negative, then the services are necessary and must be provided by the state. Such a review necessarily involves the exercise of the sound discretion of the trial court.

*State v. Olin*, 103 Idaho 391, 395, 648 P.2d 203, 207 (1982). The statute does not provide for the appointment of a "money judge," and this Court has stated that the grant or denial of assistance is left to the sound discretion of the trial court. There is no constitutional infirmity in this process. Whittier did not provide ineffective assistance of counsel by failing to seek appointment of another judge to make decisions concerning the financing of investigative and expert assistance to the defense, and the district court did not err in failing to undertake such an appointment on its own initiative.

### VII.

### CONSIDERATION OF DR. GREGORY'S REPORT AND TESTIMONY INFLU-ENCED THE DISTRICT COURT IN ITS DETERMINATION OF AGGRA-VATING FACTORS.

■ Prior to sentencing Wood, the district judge ordered a presentence investigation pursuant to Idaho Criminal Rule 32. The Rule states that "[t]he presentence investigator may recommend a psychological evaluation, but the decision as to whether to order a psychological evaluation is to be made by the sentencing judge." I.C.R. 32(d). The scope of this rule when the court makes the determination that a psychological report is warranted and orders one for inclusion in the presentence report is not in issue in this case. Dr. Gregory had already been retained pursuant to the defense's request and order of the district court to assist the defense. If a psychiatrist or psychologist had been appointed by the court for purposes of a presentence investigation, counsel for Wood would have had the opportunity to advise his client of the possible uses of the information and of the privilege against self-incrimination. In the context in which this report was prepared, Wood and his attorney were deprived of this opportunity. Wood gave infor-

mation on the basis that Dr. Gregory was his psychiatrist to assist him in his defense.

Idaho Rule of Evidence 503 provides:

Criminal action. A patient has a privilege in a criminal action to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of diagnosis or treatment of the patient's mental or emotional condition, including alcohol or drug addiction, among the patient, the patient's psychotherapist, and persons who are participating in the diagnosis or treatment under the direction of the psychotherapist, including members of the patient's family.

I.R.E. 503(b)(2).

Evidentiary rules concerning privileges "apply at all stages of all actions, cases and proceedings." I.R.E. 101(c). In *State v. Wilkins,* 125 Idaho 215, 868 P.2d 1231 (1994), this Court found that it was a violation of a criminal defendant's privileged communication with his psychotherapist for the trial court to compel the defendant's psychiatrist to testify at sentencing about communications with the defendant.

Whittier did not object to the inclusion of Dr. Gregory's report as part of the presentence report. Although there are instances in which defense counsel properly would not object, knowing that contents of the psychiatric report are favorable to the defendant, in this case the report had not been written, and Whittier did not know whether it would be favorable or unfavorable. As noted in section IV, the failure to object fell below an objective standard of reasonableness.

Whittier also did not object to the prosecution calling Dr. Gregory as a witness at the sentencing hearing. Failure to object to the prosecution calling Dr. Gregory as a witness fell below an objective standard of reasonableness as well.

In considering the death penalty the district court found, as an aggravating factor, that "[t]he defendant, by prior conduct or conduct in the commission of the murder at hand, has exhibited a propensity to commit murder which will probably constitute a continuing threat to society. I.C. 19–2515(g)(8) (1987)." In making this finding considering the death penalty, the district court relied upon the findings of Dr. Gregory, stating the following:

The Court also accepts the findings of Dr. Vicki Gregory, the Court-appointed Psychologist who examined the defendant, who concluded in her Neuropsychological Evaluation that the defendant's "sexual paraphilias cannot be treated and will escalate in intensity, frequency and violence ... [and that] [t]he Antisocial Personality Disorder cannot be treated." Dr. Gregory also concluded that "Mr. Wood poses an extreme risk of danger for the public. He also poses a high risk for other inmates and should be isolated from the general prison population."

Wood has established that, but for counsel's errors, the result of the proceedings would have been different. Wood was denied effective assistance of counsel by Whittier's failure to object. Consequently, the district court's finding of the existence of the aggravating factor set forth in I.C. § 19–2515(g)(8) (1987) is vacated.

### VIII.

### IDAHO'S STATUTORY SCHEME FOR CONSIDERATION OF THE DEATH PENALTY IS CONSTITUTIONAL, SUBJECT TO REVIEW FOR PROPER APPLICATION.

Wood makes a general assertion that Idaho's statutory scheme for consideration of the death penalty violates the Idaho and U.S. Constitutions. As in the past, this Court finds Idaho's statutory scheme for consideration of the death penalty to be constitutional.

In *Godfrey v. Georgia,* 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980), the U.S. Supreme Court held that states can impose the death penalty for certain crimes without running afoul of the federal constitutional prohibition against cruel and unusual punishment, but only if the manner in which the penalty is selected "provide[s] a 'meaningful basis for distinguishing the few cases in which [the penalty] is imposed from the many cases in which it is not.'" *Id.* at 427,

100 S.Ct. 1759 (quotation omitted) (second alteration in original). This Court has determined that Idaho's statutory scheme for consideration of the death penalty provides a meaningful basis for and is not arbitrary and capricious in distinguishing death penalty cases from other capital offenses. *State v. Card,* 121 Idaho 425, 825 P.2d 1081 (1991); *State v. Osborn,* 102 Idaho 405, 417, 631 P.2d 187, 199 (1981) ("[A] limiting construction is indispensable if the state is to meet its constitutional obligation 'to tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty.'") (citation omitted).

Furthermore, this Court has upheld the constitutionality of its death penalty statutes on numerous occasions. *Osborn,* 102 Idaho at 405, 631 P.2d at 187. *See also State v. Pizzuto,* 119 Idaho 742, 810 P.2d 680 (1991) (determining that I.C. § 19–2515 does not violate the Eighth Amendment to the federal constitution and Article I, § 6 of the Idaho Constitution), *overruled on other grounds by State v. Card,* 121 Idaho 425, 432, 825 P.2d 1081, 1088 (1991); *State v. Charboneau,* 116 Idaho 129, 774 P.2d 299 (1989) (death penalty statutes are not unconstitutional by placing burden on defendant to come forward with mitigating circumstances because burden to come forward with mitigating circumstances applies only if at least one statutory aggravating circumstance is found to exist), *overruled on other grounds by Card,* 121 Idaho at 432, 825 P.2d at 1088; *State v. Creech,* 105 Idaho 362, 370, 670 P.2d 463, 471 (1983) (concluding that the language of the statutory scheme is sufficiently narrow to avoid the arbitrary and capricious infliction of the death penalty). Wood has not shown that this long-standing precedent should be disturbed.

■ Wood also makes some specific challenges to the constitutionality of the aggravating circumstance set out in I.C. § 19–2515(g)(7). He claims that the (g)(7) aggravator is over broad, arbitrary and violates the right to due process and constitutional proscriptions against double jeopardy and cruel and unusual punishment. The (g)(7) aggravating circumstance is established when the murder is one defined in the first degree under I.C. § 18–4003(b), (c), (d), (e) or (f), and was committed with the specific intent to cause the death of a human being.[1] The district court found the (g)(7) aggravator to apply because the murder was a murder defined under § 18–4003(d), which reads: "Any murder committed in the perpetration of, or attempt to perpetrate, aggravated battery on a child under twelve (12) years of age, arson, rape, robbery, burglary, kidnaping or mayhem is murder of the first degree."

Wood claims that the (g)(7) aggravator is over broad because it applies to all intentional murders of children under the age of twelve without regard to the specific circumstances of either the defendant or the crime. He also claims that the (g)(7) aggravator makes an arbitrary distinction: intentional murders of children under the age of twelve are all made death eligible by aggravator (g)(7) while otherwise identical murders committed by identical defendants are not. There is no constitutional infirmity in making the intentional killing of a young child an aggravating factor making the defendant death eligible. Furthermore, a defendant's ability to present mitigating evidence provides the narrowing function required to distinguish intentional murders of children under the age of twelve warranting imposition of the death penalty from murders of children under twelve which do not warrant imposition of the death penalty. The (g)(7) aggravator is not over broad or arbitrary.

■ Wood also claims that an aggravator which duplicates the crime itself violates constitutional proscriptions against double jeopardy and cruel and unusual punishment in that the elements of the (g)(7) aggravator found by the district court are the same as

---

1. Section 19–2515 of the Idaho Code has been amended since the district court's imposition of the death penalty in this case. The aggravating circumstances are now under subsection (h). The (g)(7) aggravator, now codified as (h)(7), now reads: "(7) The murder was committed in

the perpetration of, or attempt to perpetrate, arson, rape, robbery, burglary, kidnapping or mayhem and the defendant killed, intended a killing, or acted with reckless indifference to human life." I.C. § 19–2515(h)(7) (1997).

elements found under § 18–4003(d) defining first degree murder.

A similar argument was dismissed by the U.S. Supreme Court in *Lowenfield v. Phelps,* 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988). In *Lowenfield,* the Supreme Court held that a death sentence did not violate the Eighth Amendment simply because the single statutory aggravating circumstance found by the jury duplicated an element of the underlying offense of first-degree murder. The *Lowenfield* Court stated:

> It seems clear to us ... that the narrowing function required for a regime of capital punishment may be provided in either of ... two ways: The legislature may itself narrow the definition of capital offenses, as ... Louisiana [has] done, so that the jury finding of guilt responds to this concern, or the legislature may more broadly define capital offenses and provide for narrowing by jury findings of aggravating circumstances at the penalty phase....
>
> Here, the "narrowing function" was performed by the jury at the guilt phase when it found defendant guilty of three counts of murder under the [Louisiana statutory] provision that "the offender has a specific intent to kill or to inflict great bodily harm upon more than one person." The fact that the sentencing jury is also required to find the existence of an aggravating circumstance in addition is no part of the constitutionally required narrowing process, and so the fact that the aggravating circumstance duplicated one of the elements of the crime does not make this sentence constitutionally infirm.

*Id.,* 108 S.Ct. at 555.

The Idaho Legislature has narrowed the class of murders that may be punished by death in I.C. §§ 18–4003 and 18–4004.[2] The fact that the (g)(7) aggravator in I.C. § 19–2515 duplicates an element of first degree murder in I.C. § 18–4003 does not violate any constitutional standard.

2. I.C. § 18–4004 provides: "Subject to the provisions of 19–2515, Idaho Code [which require the court to make an inquiry into mitigating and

## IX.

## THE DEATH PENALTY STATUTES WERE NOT UNCONSTITUTIONALLY APPLIED TO WOOD.

Wood next argues that death penalty statutes are "administered in an unconstitutional manner" and, hence, were unconstitutionally applied to him. The district court found three aggravating factors to exist in sentencing Wood: I.C. § 19–2515(g)(6), (g)(7) and (g)(8). The district court's finding of aggravating factors I.C. § 19–2515(g)(6) and (g)(7) was constitutional.

### A. I.C. § 19–2515(g)(6)

■ The district court found the existence of the aggravating circumstance set out in I.C. § 19–2515(g)(6), which is established when "[b]y the murder, or circumstances surrounding its commission, the defendant exhibited utter disregard for human life." This Court has ruled that this aggravator must be limited to the "acts or circumstances surrounding the crime which exhibit the highest, the utmost, callous disregard for human life, i.e., the cold-blooded pitiless slayer." *Osborn,* 102 Idaho at 419, 631 P.2d at 201.

In finding the (g)(6) aggravator to exist, the district court considered Wood's conduct seven days subsequent to the murder:

> The Court finds beyond a reasonable doubt, that the circumstances surrounding the murder of Jeralee Underwood, including the defendant's use of her body for his own sexual gratification, followed by his callous termination of her life, and his *sexual abuse and mutilation of her body,* exhibit the highest, the utmost disregard for human life, i.e., the acts of a cold-blooded pitiless slayer.

(Emphasis added). The "sexual abuse and mutilation of [Jeralee's] body" was later described by the district court as follows:

> Wood returned to the site of the murder, undressed the corpse, and mutilated the body by removing the sex organs and severing the arms, head, and legs. He threw

aggravating circumstances], every person guilty of murder of the first degree shall be punished by death or by imprisonment for life...."

the clothing and body parts into the Snake River.

The district court was correct in concluding that post-mortem conduct could be considered in analyzing the (g)(6) aggravator, although some jurisdictions have held that post-mortem conduct can not be considered in finding an aggravating circumstance under their statutory schemes. *See, e.g., Jackson v. State,* 451 So.2d 458, 463 (Fla.1984) ("Actions after the death of the victim are irrelevant in determining [the especially heinous, atrocious or cruel] aggravating circumstance."). In interpreting I.C. § 19–2515(g)(6), this Court agrees with the Supreme Court of Georgia:

> We cannot agree that the "offense of murder" terminates at the instant of death, so that nothing that happens afterward can be considered in determining whether the offense of murder is outrageously or wantonly vile, horrible or inhumane.

*Conklin v. State,* 254 Ga. 558, 331 S.E.2d 532, 539 (Ga.1985). The Georgia standard, while phrased in terms of "outrageously or wantonly vile, horrible or inhumane," is analogous to the exhibition of "utter disregard for human life." I.C. § 19–2515(g)(6). In *Drane v. State,* 265 Ga. 255, 455 S.E.2d 27 (Ga.1995), the court stated, "[p]ost-mortem mutilation of a body may show depravity of mind." *Id.* at 32. *See also Cavanaugh v. State,* 102 Nev. 478, 729 P.2d 481, 486 (Nev.1986) (mutilation of body parts shows depravity of mind). The mutilation of Jeralee's body was a circumstance surrounding the commission of the crime. In the most gruesome terms, it demonstrates Wood's callous disregard for human life.

Wood next claims that the "propensity to commit murder" aggravating factor, I.C. § 19–2515(g)(8), overlaps with the "utter disregard" factor, I.C. § 19–2515(g)(6). The Court has vacated the district court's finding of the (g)(8) aggravating circumstance and, therefore, it is not necessary to address this issue.

Wood also claims that the district court erred when it considered the same evidence relating to the (g)(5) aggravator (the murder was especially heinous, atrocious and cruel) in finding the (g)(6) aggravator to have been established. It is clear, following *State v. Charboneau,* 116 Idaho 129, 774 P.2d 299 (1989), *overruled on other grounds by State v. Card,* 121 Idaho 425, 432, 825 P.2d 1081, 1088 (1991), that these factors are not duplicative: "Today, this Court has held that these two factors are not duplicative." *Id.* at 153, 774 P.2d at 323 (citing to *State v. Fain,* 116 Idaho 82, 774 P.2d 252 (1989)). In *Fain,* the Court held that "[t]he aggravating factors specified in §§ 19–2515(g)(5) and (g)(6) describe two quite different kinds of culpability." *Fain,* 116 Idaho at 99, 774 P.2d at 269. However, Wood argues that, according to *State v. Osborn,* 102 Idaho 405, 631 P.2d 187 (1981), this Court must presume that the legislature did not intend that the enumerated aggravators overlap and therefore the same facts cannot be considered in support of more than one aggravator.

Wood misconstrues the holding in *Osborn.* In determining whether a certain aggravating circumstance exists, the sentencing judge may consider the same evidence he considered in relation to a different aggravator so long as he finds *additional* aggravating evidence to support a finding of that particular aggravator beyond a reasonable doubt. *Sivak v. State,* 112 Idaho 197, 210, 731 P.2d 192, 205 (1986). The record reveals that the district court properly considered additional aggravating evidence to support its finding of the (g)(6) aggravating factor. In any event, once a statutory aggravating circumstance is properly found, the court may impose the death penalty if the mitigating circumstances do not outweigh that aggravator:

> For the mitigating circumstance in this case to outweigh "any" aggravating circumstances found, the mitigating circumstances must outweigh each of the aggravating circumstances, since chance may select either one.

*Charboneau,* 116 Idaho at 153, 774 P.2d at 323.

## B. I.C. § 19–2515(g)(7)

Wood claims that he received insufficient notice that the (g)(7) aggravating factor could be applied because he was charged with premeditated murder and not murder

committed in the course of a felony. This argument is not supported by the record. Unlike *State v. Lankford*, 113 Idaho 688, 747 P.2d 710 (1987), *overruled by Lankford v. Idaho*, 500 U.S. 110, 111 S.Ct. 1723, 114 L.Ed.2d 173 (1991),[3] the record in this case reflects that on September 14, 1993, the district court expressly advised Wood that the death penalty was a possible sentence for the crimes with which he was charged. Furthermore, the guilty plea questionnaire provided to Wood asked: "What is the maximum prison sentence that you may receive for each crime?" Wood responded, "LIFE IN PRISON OR DEATH SENTENCE."

The U.S. Supreme Court has pointed out that the "existence [of a death penalty statute] on the statute books provided fair warning as to the degree of culpability which the State ascribed to the act of murder." *Dobbert v. Florida*, 432 U.S. 282, 297, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977). The Information filed against Wood charged a violation of I.C. § 18–4003(a). Although I.C. § 19–2515(g)(7) provides that the sentence of death may be imposed when "[t]he murder was one defined as murder of the first degree by section 18–4003, Idaho Code, subsections (b), (c), (d), (e) or (f), and it was accompanied with the specific intent to cause the death of a human being," I.C. § 19–2515(g)(7) (1987), sufficient facts were pled to

afford Wood adequate notice that his charged offense would be murder within I.C. § 18–4003(a) or (d).

### C. I.C. § 19–2515(g)(8)

■ Once again, it is unnecessary to address the constitutionality of I.C. § 19–2515(g)(8), as applied to Wood, based on the holding that this aggravating circumstance was based upon improper evidence. However, this Court notes that I.C. § 19–2515 requires the district court, when considering the imposition of the death penalty, to find *one* statutory aggravating factor beyond a reasonable doubt. *State v. Sivak*, 127 Idaho 387, 392, 901 P.2d 494, 499 (1995). Even though Wood was correct in his assertion that the district court erred in considering the testimony of Dr. Gregory, it does not have any effect on the ultimate imposition of the death penalty. In his Findings of Fact and Conclusions of Law entered in the postconviction proceedings, the sentencing judge stated:

> The Court clearly relied upon Dr. Gregory's report in its sentencing. However, absent Dr. Gregory's input, the Court is unable to conclude that it would not have sentenced Wood to death. There was still evidence to support two statutory aggravating circumstances under I.C. § 19–

3. In *Lankford v. Idaho*, 500 U.S. 110, 111 S.Ct. 1723, 114 L.Ed.2d 173 (1991), the U.S. Supreme Court held that the defendant's due process rights were violated where, at the time of the sentencing hearing, the defendant and his counsel did not have adequate notice that the judge might sentence the defendant to death. In *Lankford*, the trial judge had advised the defendant during his arraignment that the maximum punishment he could receive if convicted was life imprisonment or death. 500 U.S. at 112, 111 S.Ct. 1723. After the verdict was rendered, and in preparation for sentencing, the trial judge ordered the prosecution to give written notice concerning whether it would seek the death penalty. 113 Idaho at 697, 747 P.2d at 719. The prosecution specifically responded that it would not seek the death penalty. *Id.* On appeal from denial of his petition for postconviction relief, the defendant argued that the prosecutor's written notice negated the statutory notice that he could be sentenced to death. *Id.* This Court disagreed, holding that the existence of Idaho's death penalty statute, plus the advice given at defendant's arraignment was sufficient notice.

In overruling this Court's holding by finding the sentencing process unconstitutional, the U.S. Supreme Court noted:

> The State's argument is that the terms of the [death penalty] statute, plus the advice received at petitioner's arraignment, provided [adequate] notice. This argument would plainly be correct if there *had not been a presentencing order*, or if similar advice had been given after petitioner received the State's negative response and before the sentencing hearing commenced.

500 U.S. at 119–20, 111 S.Ct. 1723 (emphasis added). The U.S. Supreme Court reasoned that the presentencing order, comparable to a pretrial order limiting the issues to be tried, precluded the defense counsel from presenting argument or evidence concerning imposition of the death penalty. *Id.* at 120, 111 S.Ct. 1723.

Unlike *Lankford*, the prosecutor in the present case did not make an express statement that the State would not seek the death penalty. As previously mentioned, Wood was expressly advised that the death penalty was a possible sentence and there was nothing said by either the district judge or the prosecution to indicate otherwise.

2515(g). In order to impose the death penalty, under I.C. § 19–2515(c), only one aggravating factor need be proven beyond a reasonable doubt. Thus, the lack of Dr. Gregory's opinion might have prevented the Court from finding one statutory aggravating circumstances [sic], but would not have avoided the imposition of the death penalty.

Based upon these comments, and upon its own independent review of the record, this Court concludes, beyond a reasonable doubt, that the erroneously admitted testimony and report of Dr. Gregory at the sentencing hearing did not contribute to the sentencing judge's decision to impose the death penalty.

## X.

### WOOD WAS NOT DENIED DUE PROCESS OF LAW BY THE DISTRICT COURT'S REFUSAL TO GRANT HIM MORE TIME AND FINANCIAL ASSISTANCE TO INVESTIGATE AND PREPARE FOR THE TRIAL OF THE PETITION FOR POST–CONVICTION RELIEF.

▆▆▆▆ Wood maintains that he was not allowed enough time and financial assistance to adequately prepare for the trial of the petition for post-conviction relief. "The granting or denial of a motion for a continuance is vested in the sound discretion of the trial court and will not be disturbed on appeal unless there has been a clear abuse of discretion." *State v. Saunders,* 124 Idaho 334, 336–37, 859 P.2d 370, 372–73 (Ct.App. 1993) (citing *State v. Richardson,* 95 Idaho 446, 511 P.2d 263 (1973)). In addition, the denial of a motion for continuance will not be an abuse of discretion unless it can be shown that the substantial rights of the defendant have been prejudiced. *Id.* at 337, 859 P.2d at 373. The standard of review for a motion for continuance and additional financial assistance in a post-conviction relief proceeding is also a review for abuse of discretion.

Present counsel for Wood was appointed on April 1, 1994, to represent Wood on the appeal and post-conviction review proceedings. Wood's counsel requested forty-two days to file an amended petition and asked that the trial not be scheduled until mid-August. The district court granted the requests, ordering that the amended petition for post-conviction relief be filed by May 13, 1994. The district court scheduled trial for August 16, 1994. Thereafter, the district court rescheduled trial for October 18, 1994, at the request of Wood's counsel. The continuance was granted to permit counsel the opportunity to retain expert witnesses and have pretrial motions heard. Counsel for Wood subsequently requested that the October 18, 1994 trial date be vacated and the case continued. The district court granted the request and re-set the trial for November 29, 1994, advising counsel that no further continuances would be granted but that counsel could present some witnesses by videotape deposition if necessary to avoid difficulties in scheduling witnesses.

Trial began on November 29, but after six days of trial, Wood's attorney advised the court there would be two or three additional witness who were not immediately available to testify because of scheduling problems. The district court set the trial to resume on January 13, 1995. Thereafter, counsel for Wood requested a continuance of the January 13 trial date, indicating that his expert witnesses were not ready to testify and that he needed more funds for testing. The district court authorized the expenditure of additional funds for the testing and set the trial to resume February 22, 1995, again advising counsel that no further continuances would be granted. Immediately prior to the February 22 trial date, counsel for Wood requested another continuance to retain additional expert witness. The district court denied the request after a hearing. Counsel for Wood then advised the court that he would call Wood as a witness and requested that the trial resume on March 3, 1995. The trial was continued until March 3, 1995, at which time counsel for Wood indicated that he would not call Wood as a witness and that he had no other witnesses to call at that time. The district court indicated that the record was closed and scheduled the submission of post-trial briefs. After extending the initial time, briefing was concluded on May 26, 1995.

Nearly a year elapsed from the time counsel was appointed to represent Wood in post-conviction review proceedings until the evidence portion of those proceedings was closed. This was adequate time to prepare and present whatever evidence was necessary to properly present Wood's position. The district court granted the defense's request for additional funds for testing that the defense claimed was necessary. There is no indication that the defense was deprived of either adequate time or adequate money to properly prepare for the post-conviction relief trial. Since Wood had not shown that any of his substantial rights had been violated, the district court did not abuse its discretion in denying the motions for continuance and additional financial assistance.

## XI.

### JUDGE WINMILL DID NOT ABUSE HIS DISCRETION IN DENYING WOOD'S MOTIONS TO DISQUALIFY.

On July 11, 1994, Wood moved to disqualify Judge Winmill pursuant to I.R.C.P 40(d) and I.C.R. 25. Judge Winmill denied the motions. This Court reviews the decision to determine if the judge abused his discretion in denying the motions. *Sivak*, 127 Idaho at 389, 901 P.2d at 496; *State v. Brown*, 121 Idaho 385, 392, 825 P.2d 482, 489 (1992). In *Sivak*, this Court stated:

> [W]hen addressing a motion to disqualify brought under Criminal Rule 25, which was denied, the judge must recognize the case has been judged, that lasting opinions have been formed, and that the judge must determine if the proper legal analysis which the law requires can be performed. If the judge can make the proper legal analysis, then the motion to disqualify should be denied.

127 Idaho at 389, 901 P.2d at 496 (citations omitted). The Court of Appeals has pointed out that the "practice of having the sentencing judge also handle the post-conviction relief proceeding is approved by our Supreme Court absent a showing either of actual bias or prejudice on the part of that judge." *Freeman v. State*, 114 Idaho 521, 524, 757 P.2d 1240, 1243 (Ct.App.1988).

There has been no showing of actual bias or prejudice on the part of Judge Winmill in this case. He was in a position to perform the proper legal analysis which the law requires to be performed. He did not abuse his discretion in denying the motions to disqualify.

## XII.

### THE DISTRICT COURT PROPERLY DENIED WOOD'S REQUEST TO TAKE THE DEPOSITION OF THE PROSECUTING ATTORNEY.

Prior to trial of the claim for post-conviction relief, Wood sought to take the deposition of the prosecuting attorney to obtain "his recollection of the plea bargaining discussions between himself and trial counsel, Monte Whittier." The district court denied the request.

Wood did not cite to authority for the assertion that he should have the right to depose the prosecuting attorney, and the district court noted that this Court has not ruled on the right of a party to depose opposing counsel, including the prosecuting attorney. The district court relied on California cases holding:

> The circumstances under which opposing counsel may be deposed are limited to those where (1) no other means exist to obtain the information than to depose opposing counsel; (2) the information sought is relevant and not privileged; (3) the information is crucial to the preparation of the case.

*Spectra–Physics, Inc. v. Superior Court*, 198 Cal.App.3d 1487, 244 Cal.Rptr. 258, 263 (Cal. App. 6 Dist.1988); *Estate of Ruchti,* 12 Cal. App.4th 1593, 16 Cal.Rptr.2d 151 (Cal.App. 2 Dist.1993).

The Louisiana Supreme Court has recognized that the practice of deposing attorneys of record is greatly disfavored, because it results in "unnecessary delays, potential harassment, and, in the extreme case, to the disqualification of an attorney." *Board of Comm'rs of the New Orleans Exhibition Auth. v. Missouri Pac. R.R.*, 647 So.2d 340, 340–41 (La.1994). *But see Munn v. Bristol*

*Bay Hous. Auth.,* 777 P.2d 188, 196 (Alaska 1989) (an attorney is no more entitled to withhold information than any other potential witness, and may be required to testify at a deposition or trial as to material, non-privileged matters).

Considering the potential difficulties that may arise if counsel may be deposed, the district court adopted proper standards in determining whether Wood could depose the prosecuting attorney. Applying those standards, Wood failed to establish that no other means existed to obtain the information than to depose opposing counsel. The information Wood sought was available from Whittier. Wood also failed to establish that the information was crucial to the preparation of the case. The district court properly denied Wood's request to depose the prosecuting attorney.

## XIII.

### THE DISTRICT COURT PROPERLY DENIED WOOD'S REQUEST TO TAKE A DISCOVERY DEPOSITION OF THE COURT.

 Wood claimed a need to depose the district judge who presided in this case as the consequence of an unreported meeting held between the district judge, defense counsel and the prosecutor shortly before the guilty plea. The district court denied the request.

There is a prohibition against a judge testifying in a trial over which the judge is presiding. I.R.E. 605. Judge Winmill was the presiding judge in the post-conviction review proceedings. If his deposition were taken, he would become a witness in the post-conviction review proceedings and potentially would be required to recuse himself at trial. There are several factors that weigh strongly against such a result.

 Consistent with the decisions of other jurisdictions, this Court would not permit inquiry into the thought process or the grounds upon which a case was decided by a judge. *See United States v. Morgan,* 313 U.S. 409, 422, 61 S.Ct. 999, 85 L.Ed. 1429 (1941) (a judge's thought process relevant to

judicial decisions is not within the purview of an examination). "Public policy and convenience prohibit judges from being called as witnesses to state the grounds upon which they decided former cases." *People v. Drake,* 841 P.2d 364, 367 (Colo.Ct.App.1992). Consequently, Wood would not have been allowed to inquire into what Judge Winmill thought when he decided the case.

The question then is whether there were facts not in the record that were relevant to the post-conviction review proceedings and were not otherwise available to Wood. There has been no such showing by Wood. The district court properly denied the request for deposition.

## XIV.

### WOOD DID NOT HAVE A RIGHT TO BE PRESENT AT THE UNREPORTED MEETING HELD IN CHAMBERS.

 Wood claims that the district court violated his constitutional right to be present at the unreported meeting held between the district judge, defense counsel and the prosecutor. A defendant has the right to be present at all stages of a criminal proceeding "if absence could, under some set of circumstances, be harmful." *State v. Crawford,* 99 Idaho 87, 95, 577 P.2d 1135, 1143 (1978) (citing *Polizzi v. United States,* 550 F.2d 1133, 1137–38 (9th Cir.1976)). Wood's absence from the unreported meeting was not harmful. While plea bargaining discussions may have occurred in the meeting, the district court did not render any decision as a result of the meeting which affected Wood's rights. Wood's subsequent entry of a guilty plea was the result of an informed, voluntary decision made by him, and not the result of any discussions which may have taken place in the unreported meeting.

## XV.

### THE DISTRICT COURT DID NOT ERR IN REFUSING TO ADMIT A NUMBER OF EXHIBITS RELATING TO L.D.S. CHURCH DOCTRINE AND IN REFUSING TO ADMIT OR CONSIDER TESTIMONY CONCERNING THAT CHURCH.

 In the post-conviction relief trial, the defense sought to admit a variety of exhibits

and the testimony of James Spence, a minister and former member of the L.D.S. Church, for the purpose of impeaching a statement by Whittier that he had not heard of "blood atonement." Spence gave examples of "blood atonement," including a sermon by Brigham Young stating: "There are sins that men commit for which they cannot receive forgiveness in this world or in that which is to come; and if they had their eyes opened to see their true condition, they would be perfectly willing to have their blood spilt upon the ground; and the smoke thereof might ascend to heaven as an offering for their sins."

The theory of the defense was that the doctrine of "blood atonement" influenced several members of the church, including Whittier, in their dealings with Wood. Further, the defense maintained that church members who denied knowledge of the doctrine of blood atonement were lying and concealing the influences that motivated them in dealing with Wood.

The district court sustained the State's objection to the admission of Spence's testimony and admission of a variety of exhibits presenting evidence relating to "blood atonement," ruling that the evidence was not relevant. The district court ruled that the only relevant religious beliefs were those of Wood and anybody who discussed religion with him prior to sentencing, but that the general teachings of the L.D.S. Church were not relevant. The district court found that Spence could not speak to the issue of what Wood, Whittier, or any other members of the Whittier firm believed with regard to the doctrine of blood atonement.

The district court properly limited evidence to the beliefs of those who dealt with Wood and the statements they made to him. An exploration of the doctrine beyond that was not relevant.

Wood has asserted that refusal to admit the evidence was a denial of due process. Determination of such a denial would depend upon a finding that the evidence should have been admitted. There was no due process violation in excluding the evidence.

## XVI.

## THE DEFENSE HAS NOT DEMONSTRATED A CONFLICT OF INTEREST THAT PRECLUDED THE DISTRICT COURT FROM RULING ON EVIDENCE CONCERNING DOCTRINES OF THE L.D.S. CHURCH.

Wood also argues that the district court had a conflict of interest in ruling on the evidence presented by the defense concerning church doctrines. The Court has addressed these issues and determined that the district judge did not have a conflict of interest.

## XVII.

## AUTOMATIC SENTENCE REVIEW UNDER I.C. § 19–2827

This Court is obligated by statute to review the record of the trial court proceedings and sentencing hearing in light of the requirements of I.C. § 19–2827(c). I.C. § 19–2827; *State v. Wells*, 124 Idaho 836, 837, 864 P.2d 1123, 1124 (1993). I.C. § 19–2827(c) requires that this Court review all death sentences and that we specifically determine:

(1) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor, and

(2) Whether the evidence supports the judge's finding of a statutory aggravating circumstance from among those enumerated in section 19–2515, Idaho Code, and

(3) Whether the sentence of death is excessive.

I.C. § 19–2827(c).

As to the first element of the inquiry, this Court finds that the sentence of death was in no way imposed under the influence of passion, prejudice or any other arbitrary factor. The sentence of death imposed upon Wood was based on a voluntary guilty plea entered by Wood and substantiated by voluminous facts contained in the record.

As to the second element of the inquiry, this Court finds that the evidence supports the judge's findings as to the aggravating

circumstances found in I.C. § 19–2515(g)(6) and (g)(7). *See* Part IX.A & B.

Finally, as to the third element of the inquiry, the Idaho Legislature amended I.C. § 19–2827(c)(3) in 1994, rendering the term "excessive" meaningless. *See State v. Sivak,* 127 Idaho 387, 393, 901 P.2d 494, 500 (1995); *State v. Fields,* 127 Idaho 904, 908 P.2d 1211 (1995). Consequently, this Court declines to undertake any consideration of the "excessiveness" of Wood's sentence, beyond an independent review to determine whether the district court's finding and weighing of aggravating and mitigating factors is supported by the record.

## XVIII.

## CONCLUSION

The judgment of the district court imposing the death penalty is affirmed since the Court has determined that the district court properly applied two aggravating factors. The district court's finding of the third aggravating factor under I.C. § 19–2515(g)(8) is vacated for the reason that improper evidence was considered by the district court. Remand is unnecessary because the district court has determined that, even if the finding regarding § 19–2515(g)(8) was improper, the sentence would have been the same. The decision of the district court that Wood is not entitled to post-conviction relief is affirmed.

TROUT, C.J., and SILAK, J., concur.

McDEVITT, J., sat but did not participate because of his retirement.

JOHNSON, Justice, concurring and concurring in the result.

I concur in all of the Court's opinion, except I concur in the result of part IX (The Death Penalty Statutes Were Not Unconstitutionally Applied to Wood) because I respectfully disagree with the Court's decision concerning the application of the aggravating factor contained in I.C. § 19–2515(g)(6).

In *State v. Fain,* 116 Idaho 82, 774 P.2d 252 (1989), the Court characterized this "utter disregard" factor as referring "not to the outrageousness of the acts constituting the murder, but to the defendant's lack of conscientious scruples against killing another human being." *Id.* at 99, 774 P.2d at 269. I cannot agree that the unbelievably despicable conduct of the defendant in this case in mutilating his victim's body seven days after the murder may be considered as conduct coming within this characterization. I am concerned that the Court's expansion of the scope given to this aggravating factor will undermine the carefully crafted meaning of this subsection upon which the Court has upheld its constitutionality. This does not, however, affect the application of the aggravating factor contained in I.C. § 19–2515(g)(7) as a basis for imposing the death penalty. Therefore, I concur in the Court's decision affirming the imposition of the death penalty.