JAMES FAIRBANKS TAYLOR, Appellant, *v.* THE STATE OF NEVADA, Respondent.

No. 8212

March 25, 1976                                      547 P.2d 674

---

*George Foley,* of Las Vegas, for Appellant.

*Robert List,* Attorney General, Carson City, *George E. Holt,* District Attorney, and *Joel M. Cooper,* Deputy District Attorney, Clark County, for Respondent.

# OPINION

By the Court, ZENOFF, J.:

James Fairbanks Taylor, sentenced to life imprisonment without possibility of parole, stands convicted of the murder of Vicky Wilhelmi Price.

The principal issue on appeal stems from a previous arrest of Taylor for a crime unrelated to the murder for which he ultimately was convicted. On August 13, 1972, a woman contacted the Las Vegas Police Department claiming that she had been raped during the early morning hours of the same day. She provided the police with a description of her assailant and a description of the dwelling where the alleged rape occurred. She recalled that the name of the street upon which the house was located was "Salem" and provided that information to the police as well. Later that same day, a police officer, accompanied by the woman, traveled the designated street until she recognized the house and certain automobiles parked in front of it. The officer noted the address and the license plate number of one of the vehicles and returned to the police station. It later was ascertained that the vehicle was registered in the name of James Fairbanks Taylor.

In the early afternoon of the following day, three police officers returned to the Salem Street residence to arrest Taylor for rape. Upon answering the door, Taylor was informed of the purpose of the police visit and invited the officers inside. After Taylor was arrested and handcuffed, one of the officers walked through the premises and noted in one of the bedrooms a twin bed mattress, a blanket and various articles of clothing strewn over the floor. A police photographer was summoned who arrived approximately 1½ hours after the arrest. Photographs were taken of the exterior and interior of the house. At least one of the photographs depicted the bedroom in which the mattress and blanket were lying.

Two months later, on October 16, 1972, the nude body of Vicky Wilhelmi Price was discovered in an abandoned mine shaft near the town of Searchlight in Clark County, Nevada. The body was wrapped in a pink blanket, was bound with a certain type of electrical wiring and was covered with a twin bed mattress.

During the ensuing investigation, one of the officers who had investigated the August rape incident notified an officer investigating the Price murder that he had a photograph of a mattress. A comparison was made between the mattress found in the mine shaft and the mattress depicted in the photograph of Taylor's bedroom. It was determined that the mattresses were the same. Thereafter, the investigation began to focus rather narrowly on Taylor and ultimately he was arrested and prosecuted for the crime.

1. In essence, Taylor argues that his conviction is based upon evidence illegally seized in violation of his Fourth Amendment rights. He claims that by virtue of the exclusionary rule such evidence never should have been admitted against him at trial. We do not agree.

We acknowledge with disapprobation the action taken by the police in connection with Taylor's arrest for rape and the subsequent search of his residence. We are not persuaded by the argument of the state that the requirement of a search warrant was excused for the reason that the search was conducted incident to a lawful arrest or that exigent circumstances existed.[1] In view of the acknowledged unlawfulness of the search which produced the evidence in question, our discussion is confined to whether the exclusionary rule should apply given the rather unique circumstances of this case to preclude admission of such evidence at trial.

"The purpose of the exclusionary rule is not to redress the injury to the privacy of the search victim. . . . Instead, the rule's prime purpose is to deter future unlawful police conduct and thereby effectuate the guarantee of the Fourth Amendment against unreasonable searches and seizures. . . . In sum, the rule is a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved." United States v. Calandra, 414 U.S. 338, 347–48 (1974). "The rule is calculated to prevent, not to repair. Its purpose is to deter—to compel respect for the constitutional guaranty in

---

[1]We note also that appellant was arrested at his home without a warrant. It is apparent from the record that probable cause to arrest existed some 24 hours beforehand, yet no attempt whatsoever was made to obtain an arrest warrant. We do not discuss the propriety of such police conduct only because the issue has not properly been raised, not because it has received the imprimatur of our approval. See United States v. Watson, _____ U.S. _____ (Docket No. 74–538, filed January 26, 1976), concurring opinion of Stewart, J., and cases cited therein.

162

the only effectively available way—by removing the incentive to disregard it." Elkins v. United States, 364 U.S. 206, 217 (1960). Where no deterrent effect would be achieved by the exclusion of evidence seized as the result of an unlawful search, the United States Supreme Court has steadfastly rejected the application of the exclusionary rule. State v. McFarland, 526 P.2d 361, cert. denied 420 U.S. 1005 (Wash. 1974).

It is difficult to conceive of circumstances where the deterrent effect realized by excluding unlawfully seized evidence would be less perceptible than in the instant case. The search which divulged the objectionable evidence was directed at a crime completely unrelated to the crime for which appellant ultimately was convicted. Further, the crime for which appellant was convicted was committed two months after the unlawful search. There is no suggestion that the violation of appellant's Fourth Amendment rights by the police was willful or that it was calculated to produce evidence which would or could prove incriminating in the future. Where the police, in negligent violation of an individual's Fourth Amendment rights, inadvertently capture innocuous items by means of a photograph, which items later tend to connect the victim of the search to a crime which subsequently was committed, the photograph does not become inadmissible by virtue of the exclusionary rule. People v. McInnis, 494 P.2d 690, cert. denied 409 U.S. 1061 (Cal. 1972). Under the circumstances of this case, the purpose of the exclusionary rule would not be served by excluding the illegally seized evidence. The murder of Vicky Price was so remotely connected to the unlawful search incident to Taylor's arrest for the crime of rape that application of the exclusionary rule to exclude the evidence obtained as a result of the search could have no conceivable deterrent effect on future police misconduct of the type involved here. It would be one thing to bar the photograph of the mattress if Taylor was being tried for the rape, it is quite another to bar its use for an unrelated murder committed several months subsequent to the search.

In our view, the exclusionary rule as it presently stands constitutes a sufficient deterrence to police conduct violative of the Fourth Amendment. Any incremental deterrence achieved by an extension of the rule to encompass the facts of this case would be at best uncertain but more likely nonexistent.

2. There was also a second warrantless search of Taylor's house which divulged certain incriminating evidence. Prior to

the rape incident in August, Taylor had negotiated an exchange of his house on Salem Street for a house located on Palmdale. The owners of the Palmdale house, Alfred and Shirley Flippin, and Taylor had agreed orally to the exchange. Before the appropriate documents were executed, Taylor moved the bulk of his possessions from the house on Salem to the house on Palmdale leaving only a few items in the backyard of the Salem address. The house itself was vacant.

Although Taylor had not relinquished his key to the Salem residence, the Flippins somehow had obtained one and when, in late November of 1972, the investigation began to focus on Taylor, the police obtained the written consent of the Flippins to conduct a search of the Salem house. Alfred Flippin admitted the police to the house on November 30, 1972, and a search ensued. The search revealed a small piece of green fuzz which appeared to match some green fuzz found in the victim's hair.

A subsequent search of the house on Palmdale with a warrant uncovered a green blanket of the same hue as the fuzz. Additionally, the police discovered a spool of electrical wiring of the same type used to wrap the body found in the mine shaft.

Taylor contends, because he had not relinquished legal title to the house on Salem, that his consent or a warrant was required before a search legally could be conducted. We are not persuaded. Taylor had vacated the premises in accordance with the terms of the exchange agreement with the Flippins. Clearly, the Flippins had the right to use or occupy the Salem Street residence and consequently had the authority to consent to a police search. Radkus v. State, 90 Nev. 406, 528 P.2d 697 (1974). See also People v. Robinson, 116 Cal.Rptr. 455 (1974); People v. Carr, 502 P.2d 513 (Cal. 1972).

Affirmed.

GUNDERSON, C. J., and BATJER, MOWBRAY, and THOMPSON, JJ., concur.