PATRICK JAMES CAVANAUGH, Appellant, *v.* THE STATE OF NEVADA, Respondent.

No. 16357

December 4, 1986 729 P.2d 481

*Lovell, Bilbray, Potter & Gewerter,* Las Vegas, for Appellant.

*Brian McKay,* Attorney General, Carson City, *Robert Miller,* District Attorney, and *James Tufteland,* Deputy District Attorney, Las Vegas, for Respondent.

## OPINION

*Per Curiam:*

Appellant Patrick Cavanaugh was the mastermind of a fraudulent scheme to purchase furniture with stolen, forged checks. A "secret witness" article in a Las Vegas newspaper pictured Cavanaugh's putative wife, Diana, as a suspect in the scheme and offered a reward for information concerning the woman and her participation in the fraud. The State's theory, presented through testimony at trial, was that Cavanaugh believed that an acquaintance, Nathaniel "Buster" Wilson, had seen the article displaying the photograph of Diana and intended to inform the police. In order to prevent Wilson from contacting law enforcement authorities, Cavanaugh brutally murdered him. Cavanaugh first shot Wilson in the face, then, after discovering the victim was still alive several hours later, cut out his vocal cords and shot him two more times in the head. Cavanaugh then cut off the victim's hands and feet with an electric saw, and attempted to cut off his head. He used acid in an attempt to remove the prints from the victim's fingers, then disposed of the remains in several locations. Cavanaugh was convicted of first-degree murder with use of a deadly weapon and sentenced to death. His appeal raises numerous issues, but none merits reversal. The conviction and sentence are, therefore, affirmed.

### I. Jurisdiction

Cavanaugh argues that the trial court lacked jurisdiction

because the sole evidence that the crime occurred in Nevada was the testimony of an accomplice, Diana Cavanaugh. However, Nevada law requires only that accomplice testimony be corroborated by other evidence linking the accused to the crime. NRS 175.291. There is no additional requirement of corroborative evidence linking the crime to the state. Pamela Cavanaugh, one of appellant's former putative spouses, testified that appellant showed her the victim's severed hand and told her he had cut out the victim's vocal cords before killing him. That satisfies the statute.[1]

## II. Spousal Privilege

Cavanaugh contends that the trial court erred in allowing Diana Cavanaugh, his putative wife, to testify. We disagree. Although Nevada allows both a privilege as to confidential marital communications and an immunity from adverse spousal testimony, NRS 49.295, it appears that neither protection is available on the facts of this case.

Diana Cavanaugh participated in a marriage ceremony with appellant on November 26, 1979. At that time, Cavanaugh was married to one Toni Cavanaugh. Toni, however, obtained an annulment in New Jersey on June 13, 1980. The annulment declared their union void from its inception, but expressly was based solely on the assertion that, when Cavanaugh married Toni, he was lawfully married to Pamela Cavanaugh. Such was not the case; the marriage to Pamela was ineffective because Pamela was, at the time of her marriage to Cavanaugh, married to one Lorenzo Preciado. Since the New Jersey court apparently had jurisdiction to render its decree of annulment, we are bound to give that decree the effect it would have in New Jersey. *See* 28 U.S.C. § 1738 (1982). However, New Jersey has not indicated whether, on facts such as those of this case, its annulment would serve to entitle a subsequent putative spouse to the protection of immunity, in a criminal trial, from the testimony of a party to the allegedly annulled union.[2]

Ordinarily, one determines the availability of a spousal privilege by ruling on the validity of the marriage. An obviously void

---

[1]Appellant argues that Pamela Cavanaugh was also an accomplice, and that one Maria Russell was an accomplice as well. The record does not support that contention.

[2]The only case even remotely relevant, Shammas v. Shammas, 88 A.2d 204 (N.J. 1952), involved the distinguishable issue whether, in a civil action, such an annulment would be set aside absolutely and for all purposes. Thus, the court in *Shammas* faced a host of collateral consequences not here at issue, and did not focus on the application of privilege laws.

marriage creates no legal relationship to be protected, and a demonstrably valid marriage could hardly fall without the protection of the statute. However, while this approach normally affords certainty, it may also generate needless repercussions. Where, as here, we could resolve the question of validity only by speculation, we prefer not to disturb a host of implicated interests on the basis of such tenuity. We prefer, instead, to employ an approach more finely tuned to the one issue at hand: whether the Legislature intended the privilege to be applicable on the facts of this case.

The rationale for spousal privilege or immunity is that the relationship between the accused and the prospective witness so merits protection that society is willing to preserve its sanctity even at the expense of ascertaining truth. The relationship here at issue does not merit such protection; it is a clear example of casual indifference to the law. Evidence revealed that appellant and Diana Cavanaugh both believed, when they married, that the marriage to Pamela Cavanaugh might still be valid. They therefore used fictitious names to avoid the possibility that the marriage to Pamela would be noticed. Further, at that time Cavanaugh was still married to Toni, for the mistaken annulment (which, in turn, may have been obtained through deception) had not yet occurred. Cavanaugh apparently was also married to one Tommi Cavanaugh while married to one or more of the other women. Worse yet, Diana testified that she did not care; it was of no consequence to her whether, at the time she married Cavanaugh, he had terminated his other marriages. A relationship so fraught with deception and disregard for our marital laws is not entitled to the protection of our evidentiary privilege or immunity, where the validity of the marriage is gravely in doubt and may not be determined with certainty under existing law.[3] Admission of Diana Cavanaugh's testimony was not erroneous.

### III. Mistrial Motions

Cavanaugh unsuccessfully moved for declaration of a mistrial on four occasions. We conclude that the trial court did not err in denying those motions.

The first motion was based on law enforcement officers' having informed a prospective defense witness that if he lied under oath, he could be punished for perjury. A mere warning of this nature

---

[3]We note that this approach will be applicable only in the rarest of cases; courts are not excused from their duty to attempt to determine whether a marriage is valid, in ruling on a claim of privilege.

does not infringe a criminal defendant's rights even if, as a result, his prospective witness declines to testify. *See* United States v. Harlin, 539 F.2d 679 (9th Cir.), *cert. denied,* 429 U.S. 942 (1976); *cf.* Webb v. Texas, 409 U.S. 95 (1972).

Another motion involved an unauthorized communication between the trial court and the jury. The jurors, during their penalty deliberations, asked the court whether one sentenced to life imprisonment without the possibility of parole might somehow be paroled. The trial court, without contacting counsel, instructed the jury to refer to an instruction on executive clemency. While the court erred in answering without notice to counsel, NRS 175.451; Varner v. State, 97 Nev. 486, 634 P.2d 1205 (1981), the error was harmless, for the instruction was correct.[4] *See id.*

Questions from the bench prompted still another mistrial motion. While Cavanaugh was on the stand, the court asked whether he had any doubt that the decomposed body found in California was that of Buster Wilson. The sole issue is whether, after Cavanaugh answered that he had no doubt the body was Wilson's, the trial court abused its discretion in allowing the trial to go forward. *See* Reese v. State, 95 Nev. 419, 596 P.2d 212 (1979). We hold that it did not, for three reasons: there was strong evidence of identification; Cavanaugh's defense strategy had not included affirmative denial that the body was that of Mr. Wilson; and Cavanaugh raised no specific contemporaneous objection to the question.

Finally, the trial court did not err in refusing to declare a mistrial after the prosecutor elicited testimony that a Mr. Cioffe, Diana Cavanaugh's brother, was dead. Cavanaugh argues that the prosecutor wished to induce a belief that he had killed Cioffe. However, the trial court directed full disclosure that Mr. Cioffe died in an unrelated traffic accident. There was no prejudice; the court did not abuse its discretion in allowing the trial to continue.

## IV. Evidentiary Rulings

Cavanaugh challenges several of the trial court's rulings on

---

[4]Essentially, the instruction said appellant could be pardoned or have his sentence commuted. Appellant's trial preceded our ruling in Petrocelli v. State, 101 Nev. 46, 692 P.2d 503 (1985), wherein we prescribed, prospectively, a format for such instructions. Appellant alleges only that life without parole means life without parole, and that any instruction to the contrary is inaccurate. He is incorrect.

admissibility of evidence. However, there was no reversible error.

First, the trial court did not err in admitting evidence of Cavanaugh's conviction on more than thirty counts of fraud. The convictions were for participation in the fraudulent scheme known to Mr. Wilson, for which knowledge he was permanently silenced. Evidence of other instances of conduct is admissible to prove the motive for a crime. NRS 48.045(2). Thus, there was no error.[5]

Second, assuming *arguendo* that the trial court may have erred in excluding as irrelevant a transcript of testimony of an unavailable witness, no prejudice resulted. Cavanaugh wished to introduce the testimony of an Officer Holcomb to show that Cavanaugh cooperated with the police when questioned about the fraudulent scheme discussed above. However, a Detective Allen testified extensively as to Cavanaugh's cooperativeness at the time of his arrest.[6] Further, Officer Holcomb's testimony was to the effect that Cavanaugh's excessive cooperation aroused suspicion. Detective Allen's testimony was more favorable to Cavanaugh. Thus, reversal is unnecessary. NRS 47.040(1); 178.598.

Third, the trial court did not err in admitting into evidence a box of bullets allegedly unlawfully seized during a search in the course of an investigation of Cavanaugh's participation in the fraud.[7] The exclusionary rule exists to deter misconduct; we have already held that where (1) the allegedly improper search involved a completely different crime, (2) the officers involved had no idea that the knowledge they gained would become useful in the prosecution of another offense, and (3) the violation of rights was unintentional, there is nothing to deter and the exclusionary rule does not apply. Taylor v. State, 92 Nev. 158, 547 P.2d 674 (1976). *Taylor* is fully applicable here; assuming

---

[5]It is of no consequence that the convictions followed, rather than preceded Wilson's death; the underlying acts of fraud were not shown to have been subsequent to the murder, and they would have had probative value in any event.

[6]We perceive no significance in the fact that Officer Holcomb's questioning and the arrest occurred at different times.

[7]The bullets were in a filing cabinet containing evidence of fraud. The police impounded the cabinet as a whole, although the warrant's list of items to be seized included neither the cabinet nor the bullets. However, there was no evidence that the officers involved intended any impropriety or realized their actions were questionable.

*arguendo* that the seizure was improper, the evidence still was admissible.

## V. Other Alleged Guilt-Phase Errors

Prior to his trial, Cavanaugh sought a writ of habeas corpus. The issue of spousal privilege arose; Cavanaugh claimed that certain testimony before the grand jury was privileged. To resolve that issue, the court heard evidence regarding Cavanaugh's marital status. Cavanaugh claims this was improper, since the grand jury did not hear that evidence. Cavanaugh's argument confuses two doctrines. When an accused alleges that the evidence presented to the grand jury is inadequate to show probable cause, the state may not present additional evidence of guilt in an attempt to justify the indictment.[8] However, this does not preclude admission of evidence concerning the applicability of a privilege when the issue is whether the grand jury improperly heard the evidence on which its indictment was based.

Nor did the court err in refusing a proffered jury instruction concerning the weight to be given a perjurer's testimony. Other instructions covered that issue; repetition is not required, Roland v. State, 96 Nev. 300, 608 P.2d 500 (1980).

## VI. Aggravating Circumstances

The death penalty is appropriate only if, *inter alia,* at least one statutory aggravating circumstance is present. NRS 200.030(4)(a). The jury found two such factors present: that the murder was committed to avoid a lawful arrest, NRS 200.033(5), and that it involved torture, depravity of mind, or mutilation of the victim, NRS 200.033(8). Cavanaugh's challenges to these findings are meritless.

First, Cavanaugh argues that a murder is not committed to avoid a lawful arrest, for purposes of the statute, unless arrest is imminent and the victim was in some way involved in effectuating the arrest. That, however, is not what the statute says. Wilson's murder clearly was perpetrated to avoid arrest, and no more is required. *Accord* White v. State, 403 So.2d 331 (Fla. 1981), *cert. denied,* 463 U.S. 1229 (1983); Riley v. State, 366 So.2d 19 (Fla. 1978), *cert. denied,* 459 U.S. 981 (1982). This also disposes of Cavanaugh's claim that the statute is vague; we conclude that it is unambiguous.

---

[8]*See, e.g.,* Peterson v. Sheriff, 92 Nev. 287, 549 P.2d 752 (1976).

Cavanaugh also asserts that dismemberment of the victim's body after death is not "mutilation" within the meaning of NRS 200.033(8). We need not reach that issue; the amputations show depravity of mind, particularly in combination with Cavanaugh's other conduct. Further, Cavanaugh's removal of the victim's vocal cords preceded the slaying, and clearly constituted mutilation. Therefore, there was no error.

We have considered other cases in which the death penalty was imposed, and we conclude that Cavanaugh's sentence is neither excessive nor disproportionate,[9] considering both the crime and the defendant. This case involves a carefully-plotted, cold-blooded crime of a brutal and depraved nature, committed over a period of hours, with mutilation of the body before death and dismemberment thereafter, all merely to avoid incrimination in an unrelated lesser offense. The death penalty has been imposed many times in Nevada for less shocking murders. *See, e.g.,* Wilson v. State, 101 Nev. 452, 705 P.2d 151 (1985); Farmer v. State, 101 Nev. 419, 705 P.2d 149 (1985); Nevius v. State, 101 Nev. 238, 699 P.2d 1053 (1985); Petrocelli v. State, *supra.* There is also no evidence that passion, prejudice or any other arbitrary factor influenced the choice of penalty. Accordingly, Cavanaugh's conviction and sentence are affirmed.

---

[9]NRS 177.055(2)(d) was recently amended to abolish the proportionality review requirement. This amendment became effective June 6, 1985. 1985 Stats. ch. 527 § 1, at 1597-1598. The prohibition against ex post facto laws requires that we apply the law as it existed when the crime was committed. *See* Goldsworthy v. Hannifin, 86 Nev. 252, 468 P.2d 350 (1970) (an act amending parole eligibility could not be applied to the detriment of a defendant whose crime was committed before the amendment took effect). Because Wilson was murdered well before June 6, 1985, we must conduct a proportionality review of Cavanaugh's sentence.