# UNITED STATES

v.

**Kenneth G. PARKER, Lance Corporal (E–3), U.S. Marine Corps.**

**NMCCA 9501500.**

U.S. Navy–Marine Corps Court of Criminal Appeals.

Sentence Adjudged 20 July 1993.

Decided 28 Feb. 2007.

---

CDR Sherry J. King, JAGC, USN, Appellate Defense Counsel.

Maj Rolando R. Sanchez, USMC, Appellate Defense Counsel.

Maj Jeffrey S. Stephens, USMC, Appellate Defense Counsel.

LT Jessica Hudson, JAGC, USN, Appellate Government Counsel.

Before WAGNER, Chief Judge, ROLPH, Senior Judge, and VINCENT, Appellate Military Judge.

WAGNER, Chief Judge:

The appellant was convicted, contrary to his pleas, by a general court-martial composed of officer members, of conspiracy to commit robbery and murder, conspiracy to commit kidnapping and murder, two specifications of violation of a general order, two specifications of premeditated murder, robbery, and two specifications of kidnapping.[1] The appellant was sentenced to death, forfeiture of all pay and allowances, and reduction to pay grade E–1. The convening authority approved the sentence as adjudged. This court set aside the convening authority's initial action and a new convening authority once again approved the sentence as adjudged. The appellant has filed his brief and assignments of error, supplemental brief and assignments of error, replies to the Government answers, and briefs and replies on specified issues. The Government has filed answers to the appellant's filings. In response to a petition for extraordinary relief filed by the appellant, the Court of Appeals for the Armed Forces stayed the appellate proceedings by this court, but later lifted the stay on all matters except for matters re-

---

1. The offenses violated Articles 81, 92, 118, 122, and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 881, 892, 918, 922, and 934.

garding a mental health evaluation previously ordered by this court. *Parker v. United States*, 60 M.J. 446 (C.A.A.F.2005).

On 22 March 2005, the Court of Appeals for the Armed Forces granted extraordinary relief requested by the appellant and ordered the Government to provide the appellant with an expert consultant for purposes of the pending litigation. The order continued the stay on matters regarding the mental health evaluation and specified the following issue to this court for resolution: Whether, in light of the intelligence quotient (IQ) score of the appellant and current Supreme Court precedent, the sentence to death continues to be available in the appellant's case. *Parker v. United States*, 61 M.J. 63 (C.A.A.F.2005). The parties provided oral argument on the specified issue. For the reasons provided below, we answer the specified issue in the affirmative, that the sentence to death continues to be available in the appellant's case.

### Background

At trial, the defense called Dr. Antonio Puente, Ph.D., an expert in neuropsychology, as a witness. Neuropsychology is the field of study that bridges the gap between brain function and behavior. Record at 1301. While the appellant was in pretrial confinement, Dr. Puente met with him for about ten hours over two sessions, interviewing the appellant, conducting neuropsychological tests, and reviewing the appellant's personal, medical, and education history. *Id.* Specifically, Dr. Puente obtained a personal and medical history from the appellant, reviewed his high school standardized tests scores, and reviewed a social worker's report addressing the appellant's personal history. *Id.* at 1303–05. The appellant's history revealed that he was physically and sexually abused as a youth, experienced a difficult childhood, and abused drugs and alcohol. *Id.* at 1305.

Dr. Puente also administered the Wechsler Adult Intelligence Scale test to determine the appellant's IQ, resulting in a full scale IQ score of 74. *Id.* Dr. Puente's observation was that the appellant scored better in areas involving well-stored memory, but worse in areas involving problem solving, finding the latter scores to be in the borderline retardation range. *Id.* Generally, he found the appellant to be functioning at the level of a 15–year–old at the time of his observations. *Id.* at 1306. Dr. Puente also opined that the appellant suffered from brain damage and that his ability to problem solve was on the level of a 9–year–old. *Id.* at 1307. He also found that the appellant had difficulty remembering complex things and learning from complex verbal information. *Id.* at 1308.

Dr. Puente further testified that the appellant was not "crazy" and that he passed tests administered to determine if he was "faking" his mental state. *Id.* at 1309. Dr. Puente addressed the appellant's success in the Marine Corps by attributing it to the highly structured environment that enhances an individual's functional ability. *Id.* at 1311. He opined that although the appellant was normally able to appreciate the wrongfulness of his actions in spite of his mental defects, the voluntary intoxication of the appellant on 26 March 1992, when combined with the appellant's mental defects, made him unable to appreciate the consequences and quality of the act of "pulling the trigger." *Id.* at 1312–13. During trial counsel's cross-examination, Dr. Puente testified extensively regarding the various tests he had administered to the appellant, the appellant's personality disorder, the appellant's twelfth-grade reading level, standardized tests scores, and the effect of alcohol on the appellant's mental defects. *Id.* at 1314–28. There was no testimony regarding scaling of the test scores or whether the appellant was or was not considered mentally retarded based on his test scores and personal history.

Following trial, Dr. Puente provided an affidavit in which he asserts that he has reviewed the neuropsychological report of the appellant and has formed the opinion that the appellant is psychometrically[2] mentally retarded. Appellant's Motion to Attach of 14 Apr 2006 at 1. Dr. Puente explained that a true IQ score of 70 is acceptable as

---

**2.** Psychometrics is the branch of psychology dealing with the measurement of psychological variables, such as intelligence, aptitude, and personality traits. WEBSTER'S II, New College Dictionary, Houghton Mifflin Company, 1995.

two standard deviations below the mean, which is the level at which mental retardation is recognized. *Id.* at 2. The application of a Standard Error of Measurement (SEM) of five points to the observed IQ score of 74 brings the appellant's possible true IQ score to as low as 69. *Id.* Additionally, the observed IQ score must be adjusted by the "Flynn effect," a scale developed by a political scientist that explains IQ level increases in industrialized countries. *Id.* The Flynn effect postulates that, as IQ tests get older, populations do not get smarter, they just accumulate more information as common knowledge, resulting in better scores on the older tests. *Id.* Adjusting the appellant's observed IQ test score for both the SEM and the Flynn effect, the appellant's true score could be as low as 65. *Id.* at 3. The final factor supporting Dr. Puente's opinion as to the mental retardation of the appellant is the appellant's failing grades during his developmental years. *Id.*

### Applicable Law

■■■ Since the appellant was sentenced, the Supreme Court has ruled that the imposition of the death penalty on the mentally retarded constitutes cruel and unusual punishment under the Eighth Amendment to the Constitution. *Atkins v. Virginia,* 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002). The Court noted that "[n]ot all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus." *Id.* at 317, 122 S.Ct. 2242. In determining how that class of persons should be defined, however, the Court did not frame a definition of mental retardation or provide a method for determining mental retardation. Rather, the Court left " 'to the states the task of developing appropriate ways to enforce the constitutional restriction upon execution of sentences.' " *Id.* (quoting *Ford v. Wainwright,* 477 U.S. 399, 405, 416–17, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986)). By the plain language of the *Atkins* decision, we are directed to seek a standard for defining mental retardation in the military justice system that ensures that the level of mental impairment that will qualify as mentally retarded is one which would receive a national consensus among the various state and Federal jurisdictions.

In 1989, only two states shielded mentally retarded persons from receiving the death penalty. *Penry Revisited: Is Execution of a Person Who Has Mental Retardation Cruel and Unusual?,* Paul B. Herbert, J.D., M.D., and Kathryn A. Young, J.D., J. AM. ACAD. PSYCHIATRY LAW 30:282–6, 2002. By 2002, and prior to the *Atkins* decision, 20 of the 38 states with a capital punishment statute shielded the mentally retarded from imposition of the death penalty. *Id.* The website for the Death Penalty Information Center, http://www.deathpenaltyinfo.org (2007) lists 26 states with statutes defining mental retardation. Of those 26, 24 have adopted some variant of the test established by the American Association on Intellectual and Developmental Disabilities (formerly the American Association for the Mentally Retarded or AAMR):

> Mental retardation is a disability characterized by significant limitations both in intellectual functioning and in adaptive behavior as expressed in conceptual, social, and practical adaptive skills. This disability originates before age 18.

American Association on Mental Retardation, *Mental retardation: Definition, Classification, and Systems of Supports* 5 (Ruth Luckasson ed., 10th ed.2002). This manual further states that, although IQ scores can be used as part of this analysis, they cannot be relied on solely to determine mental retardation. *Id.* Each of the 24 states adopting the AAMR test requires consideration of the IQ of the offender, evidence of the offender's adaptive functioning ability, and onset of the mental retardation at a young age, usually before age 18. The other two states allow a presumption of mental retardation for persons scoring 70 or below on a standardized IQ test.

■■■ We adopt the definition of mental retardation from the American Association on Intellectual and Developmental Disabilities as it applies to the imposition of the death penalty in the Navy and Marine Corps. In determining whether an offender meets this definition, standardized IQ scores scaled by the SEM and the Flynn effect will be consid-

ered, along with evidence of the offender's adaptive functioning ability, and onset of the mental retardation before the age of 18. The burden of persuasion is on the offender by a preponderance of the evidence. We, therefore, answer the issue specified to this court by the Court of Appeals for the Armed Forces in the affirmative, that is, the penalty of death is still available in the appellant's case.

We recognize that the record in this case does not exhibit a full and fair opportunity for the appellant to establish by a preponderance of the evidence that he is mentally retarded and that the death penalty is, therefore, prohibited by the Eighth Amendment based on the Supreme Court's holding in *Atkins*. A limited hearing, conducted by a military judge, for the purpose of developing the evidence on the issue of mental retardation and making appropriate factual determinations is required. *United States v. DuBay*, 37 C.M.R. 411, 1967 WL 4276 (C.M.A. 1967). Until the stay imposed by our superior court on the mental health evaluation ordered by this court at the request of the appellant is lifted, however, we cannot proceed on that matter.

Senior Judge ROLPH and Judge VINCENT concur.