# IN THE SUPREME COURT OF THE STATE OF NEVADA

JEREMIAH DIAZ BEAN,
Appellant,
vs.
THE STATE OF NEVADA,
Respondent.

No. 69232

FILED

SEP 20 2019

ELIZABETH A. BROWN
CLERK OF SUPREME COURT
BY
DEPUTY CLERK

## ORDER OF AFFIRMANCE

This is an appeal from a judgment of conviction in a death penalty case. Third Judicial District Court, Lyon County; John Schlegelmilch, Judge.

Appellant Jeremiah Bean entered the home of Robert and Dorothy Pape in Fernley, Nevada, shot them to death, took property from their home, and drove away in their truck. Bean became stranded on Interstate 80, shot Elliezear Graham to death after Graham stopped to help him, and returned to Fernley driving Graham's truck. Bean parked the truck in the Pape's garage and set it on fire. He later entered the home of Angie Duff and Lester Leiber where he shot and stabbed Leiber to death, stabbed Duff to death, and left the home with their pistol. A jury convicted Bean of four counts of first-degree murder with the use of a deadly weapon, victim 60 years of age or older; first-degree murder with the use of a deadly weapon; burglary with the use of a firearm; grand larceny; grand larceny of a motor vehicle; first-degree arson; robbery with the use of a deadly weapon; burglary obtaining a firearm; and grand larceny of a firearm. Bean was sentenced to death for each count of first-degree murder and various consecutive terms of imprisonment for the other offenses.

SUPREME COURT
OF
NEVADA

(O) 1947A

19-39319

On appeal, Bean raises eight issues: (1) the district court erred in denying the defense motion to declare Bean intellectually disabled, (2) the district court abused its discretion in limiting defense questions during jury selection, (3) the district court abused its discretion in denying the defense motion for a change of venue based on pretrial publicity, (4) the district court abused its discretion by admitting evidence of Bean's drug use, (5) the district court abused its discretion in admitting evidence of Bean's juvenile record, (6) the district court abused its discretion in excluding evidence that Bean offered in mitigation, (7) the death penalty is unconstitutional or otherwise unlawful, and (8) cumulative error warrants reversal of the judgment of conviction. We conclude that none of these claims or our mandatory review under NRS 177.055(2) warrants relief from the judgment of conviction and death sentences. We therefore affirm.

*Intellectual disability*

Bean argues that the district court erred in denying his motion to strike the death penalty due to intellectual disability. We review the district court's legal conclusions de novo but will defer to its factual findings that are supported by the record. *Ybarra v. State,* 127 Nev. 47, 58, 247 P.3d 269, 276 (2011).

To prevail on his motion, Bean had to prove by a preponderance of the evidence that he is intellectually disabled. NRS 174.098(5)(b). The definition of "intellectually disabled" has three components: (1) "significant subaverage general intellectual functioning;" (2) "deficits in adaptive behavior;" and (3) onset of both intellectual and adaptive deficits "during the developmental period." NRS 174.098(7); *see also* Am. Ass'n on Intellectual & Developmental Disabilities, Intellectual Disability:

Definition, Classification, and Systems of Supports 5 (11th ed. 2010) [hereinafter AAIDD-11].

The first component—significant subaverage intellectual functioning—is not defined in NRS 174.098. The clinical definition of "subaverage intellectual functioning" is "an IQ score that is approximately two standard deviations below the mean." AAIDD-11, *supra*, at 31. Two standard deviations below the mean (100) is approximately 30 points, which equates to a score of approximately 70 points or lower. *Hall v. Florida*, 572 U.S. 701, 711-12 (2014); *Ybarra*, 127 Nev. at 54-55, 247 P.3d at 274. Because the court must also take into account the test's standard error of measurement (SEM), which reflects "the inherent imprecision of the test itself," *Moore v. Texas*, 137 S. Ct. 1039, 1049 (2017) (internal quotation marks omitted); *see also Ybarra*, 127 Nev. at 54-55, 247 P.3d at 274, a person's IQ score is best understood as a range that takes into account the SEM rather than as a single fixed number, *Hall*, 572 U.S. at 712, 723. Where the lower end of the range falls two standard deviations below the mean, the person has significant subaverage intellectual functioning. *Moore*, 137 S. Ct. at 1049; *see also Ybarra*, 127 Nev. at 54-55, 247 P.3d at 274.

Bean first argues that the district court refused to consider the SEM. We are troubled by the district court's repeated references to fixed scores or intelligence range labels during the hearing and in its order while expressing antipathy toward consideration of the SEM. But even assuming the district court ignored the SEM, that error was harmless because the outcome would be the same. In particular, the district court credited test results that placed Bean's IQ between 78 and 83 when the SEM is taken

into account, thus placing Bean less than two standard deviations below the mean even at the low end of the range.

Bean next complains that the district court did not take into account the "Flynn effect." The Flynn effect accounts for the theory that the average IQ score on a particular test gradually increases over time and therefore "a person who takes an IQ test that has not recently been normed against a representative sample of the population will receive an artificially *inflated* IQ score." *Smith v. Ryan*, 813 F.3d 1175, 1184 (9th Cir. 2016). The Supreme Court has never discussed whether or how courts should adjust IQ scores for the Flynn effect, and there is no consensus in other jurisdictions.[1] Moreover, the manuals for the IQ tests used in this case

---

[1]*Compare Black v. Bell*, 664 F.3d 81, 96 (6th Cir. 2011) (recognizing that Tennessee law required district court to consider evidence of Flynn effect), *U.S. v. Parker*, 65 M.J. 626, 629-30 (N-M Ct. Crim. App. 2007) ("In determining whether an offender [is intellectually disabled], standardized IQ scores scaled by the SEM and Flynn effect will be considered"), *and Walker v. True*, 399 F.3d 315, 319, 322-23 (4th Cir. 2005) (recognizing that Virginia law required consideration of the Flynn effect in litigating an intellectual disability claim), *with McManus v. Neal*, 779 F.3d 634, 653 (7th Cir. 2015) (concluding district court could properly disregard Flynn effect as it was not required by *Atkins v. Virginia*, 536 U.S. 304 (2002)), *Hooks v. Workman*, 689 F.3d 1148, 1170 (10th Cir. 2012) ("*Atkins* does not mandate an adjustment for the Flynn effect. Moreover, there is no scientific consensus on its validity."), *Richardson v. Branker*, 668 F.3d 128, 152 (4th Cir. 2012) (noting that *Atkins* does not require courts to account for the Flynn effect in evaluating intellectual disability), *In re Mathis*, 483 F.3d 395, 398 n.1 (5th Cir. 2007) (noting that Fifth Circuit has not recognized scientific validity of Flynn effect), *and Reeves v. State*, 226 So. 3d 711, 739 (Ala. Crim. App. 2016) (concluding that trial court was not required to adjust for Flynn effect given lack of scientific consensus supporting the theory).

apparently do not recommend subtracting points for the Flynn effect. *See* Leah D. Hagan & Thomas J. Guilmette, *The Death Penalty and Intellectual Disability: Not So Simple*, 32 Crim. Justice 21, 24 (Fall 2017). Absent controlling legal authority or consensus in the medical community, we conclude that the district court did not err in considering the IQ scores without adjustments for the Flynn effect. *See Moore*, 137 S. Ct. at 1048-49 (acknowledging that a court's determination regarding intellectual functioning should be informed by the medical community's diagnostic framework).

Finally, Bean challenges the district court's decision that he failed to demonstrate significant subaverage intellectual functioning. During the evidentiary hearing, the district court heard two expert opinions: the State's expert, Dr. Mahaffey, concluded that Bean was not intellectually disabled and Bean's expert, Dr. Weiher, concluded that he was. Several objective factors support the district court's conclusion that Dr. Mahaffey's test results and opinion were more reliable. Dr. Mahaffey had more experience conducting *Atkins* examinations. The testing protocol she used had a smaller SEM and therefore could more precisely reflect Bean's IQ range, which she concluded fell between 78 and 83. Dr. Mahaffey tested for malingering on the same day she administered the intellectual functioning test and adhered to testing procedure, whereas Dr. Weiher did not conduct his malingering test concurrently with his cognitive testing and materially deviated from other testing protocols. Finally, Dr. Mahaffey's results were consistent with Bean's prior academic achievement and scores on other objective measures of cognitive ability, all of which indicated that Bean had more cognitive ability than reflected in Dr. Weiher's testing. Evidence of Bean's cognitive functioning that is consistent with Dr.

Mahaffey's test results includes the following: school records indicating that Bean was considered a good student during his early elementary school years; low test results in the ninth grade that were consistent with his two-year absence from school but were not so low as to suggest cognitive deficits; testimony that Bean was an avid reader and was known to write long letters and short stories as a child; and Bean's attempt to feign mental illness while speaking with officers, which is inconsistent with significantly subaverage intellectual functioning. Accordingly, substantial evidence supports the district court's findings that Dr. Mahaffey's test results and opinion as to Bean's intellectual functioning were more credible and reliable.

The test results that the district court credited reflect an IQ range of 78-83, placing Bean less than two standard deviations below the mean. Bean therefore did not establish significant subaverage intellectual functioning by a preponderance of the evidence. Because we agree with the district court that Bean did not meet his burden of proof as to the first component of the intellectual-disability analysis, we need not address the other two components.[2]

---

[2]We note, however, that the district court's analysis as to the adaptive-deficits component is flawed in at least two respects that reflect a misunderstanding of the relevant clinical standards. First, the court erred by focusing on Bean's adaptive behavior in comparison to his drug addicted peer group and gang subculture rather than his larger ethnic or national origin. *See* Marc J. Tasse, *Adaptive Behavior Assessment & the Diagnosis of Mental Retardation in Capital Cases*, 16 Applied Neuropsychology 114, 120 (Feb. 2009); *see also See United States v. Wilson*, 170 F. Supp. 3d 347, 369 (E.D.N.Y. 2016) (explaining that a court should not base its finding regarding intellectual disability on "'criminal adaptive functioning'" (quoting Am. Ass'n on Intellectual & Developmental Disabilities, User's Guide: Intellectual Disability: Definition, Classification, and Systems of Supports 20 (11th ed. 2012)). Second, the district court erred by attributing

SUPREME COURT
OF
NEVADA

(O) 1947A

6

*Voir dire*

Bean argues that the district court improperly limited voir dire during jury selection by prohibiting case-specific questions about veniremembers' ability to consider all available sentencing options and the kind of circumstances they would consider to be mitigating. We review the district court's rulings concerning the conduct of voir dire for an abuse of discretion. *Cunningham v. State*, 94 Nev. 128, 130, 575 P.2d 936, 938 (1978).

Voir dire allows the court and the parties to determine whether veniremembers can impartially consider the facts and apply the law as directed by the court. *Johnson v. State*, 122 Nev. 1344, 1354, 148 P.3d 767, 774 (2006). To achieve that purpose, parties may ask "whether [a potential juror's] views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Wainright v. Witt*, 469 U.S. 412, 424 (1985) (quoting *Adams v. Texas*, 448 U.S. 38, 45 (1980)).

---

Bean's adaptive deficits solely to a conduct disorder. *See Moore*, 137 S. Ct. at 1051 (recognizing that many intellectually disabled people also have other mental or physical impairments and courts should not require defendant to show that deficits were unrelated to a personality disorder); *United States v. Wilson*, 170 F. Supp. 3d 347, 371 (E.D.N.Y. 2016) ("stating that "a defendant is not required to rule out other contributing causes of his adaptive deficits in order to meet the standard for intellectual disability"); The Death Penalty and Intellectual Disability 279 (Edward Polloway, ed. 2015) (noting more than forty percent of people with an intellectual disability also have another form of mental disorder).

The district court permitted Bean to ask whether the veniremembers could consider all of the potential penalties if Bean was convicted of multiple murders and whether the veniremembers could consider all of the penalties if Bean was convicted of killing an older victim. But the court drew the line at a hypothetical question incorporating both inquiries because it too closely mirrored the facts of the case. We conclude that the district court could have precluded both lines of inquiry because they went beyond what was necessary to determine whether the veniremembers could apply the law to the facts of this case and instead touched on anticipated instructions and the verdict that the veniremembers might return given specific facts. *Cf. Witter v. State*, 112 Nev. 908, 915, 921 P.2d 886, 892 (1996) (concluding that parties may not ask "how a potential juror would vote during the penalty phase of trial" because such a question goes "well beyond determining whether a potential juror would be able to apply the law to the facts of the case"), *abrogated on other grounds by Nunnery v. State*, 127 Nev. 749, 263 P.3d 235 (2011).

The district court also prevented Bean from asking veniremembers to imagine what circumstances they might consider as mitigating. Bean's question went beyond acquiring information about whether the veniremembers could consider mitigating evidence and invited them to stake their own positions regarding what information they would consider to be mitigating before they had been instructed on the governing legal principles. That kind of question is improper. *See Hogan v. State*, 103 Nev. 21, 23, 732 P.2d 422, 423 (1987) (explaining that the court may exclude questions that are not directed at acquiring information about the veniremembers' ability to be fair and impartial or are "aimed more at indoctrination than acquisition of information"); *State v. Phillips*, 268

SUPREME COURT
OF
NEVADA

(O) 1947A

S.E.2d 452, 455 (N.C. 1980) ("Counsel should not fish for answers to legal questions before the judge has instructed the juror on applicable legal principles by which the juror should be guided."). We therefore conclude that the district court did not abuse its discretion in sustaining the objection.

*Venue*

Bean argues that the district court should have granted his motion for a change of venue because the murders were highly publicized and therefore he could not get a fair trial in the small community where the murders occurred. We review the district court's decision for an abuse of discretion. *Libby v. State*, 109 Nev. 905, 913, 859 P.2d 1050, 1055 (1993), *vacated on other grounds by Libby v. Nevada*, 516 U.S. 1037 (1996).

A defendant seeking a change of venue must demonstrate two things: "inflammatory pretrial publicity" and "actual bias on the part of the jury empaneled." *Floyd v. State*, 118 Nev. 156, 165, 42 P.3d 249, 255 (2002), *abrogated on other grounds by Grey v. State*, 124 Nev. 110, 178 P.3d 154 (2008); *see also Sonner v. State*, 112 Nev. 1328, 1336, 930 P.2d 707, 712 (1996) (providing that a defendant seeking a change of venue must present evidence of both inflammatory pretrial publicity and actual bias on the part of the jury), *modified on rehearing on other grounds by* 114 Nev. 321, 955 P.2d 673 (1998). Bean showed neither. The voir dire transcript does not demonstrate that the media coverage had become so saturated that a fair and impartial jury could not be seated. Many veniremembers had seen little or no media reports of the crime. No veniremembers were dismissed because they could not be impartial due to exposure to news reports. None of the empaneled jurors indicated that the publicity would prevent them from acting impartially. *See Floyd*, 118 Nev. at 165, 42 P.3d at 255 ("Even

SUPREME COURT
OF
NEVADA

(O) 1947A

where pretrial publicity has been pervasive, this court has upheld the denial of motions for change of venue where the jurors assured the trial court during voir dire that they would be fair and impartial in their deliberations."). We therefore conclude that the district court did not abuse its discretion in denying the motion.

*Prior bad acts*

Bean argues that the district court erred in admitting evidence of his uncharged drug use during the weekend of the murders. We disagree.

A party seeking to introduce evidence of uncharged bad acts must establish "(1) the prior bad act is relevant to the crime charged and for a purpose other than proving the defendant's propensity, (2) the act is proven by clear and convincing evidence, and (3) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice." *Newman v. State*, 129 Nev. 222, 230-31, 298 P.3d 1171, 1178 (2013) (internal quotation marks omitted). Evidence of Bean's drug use was relevant to his motive to commit the crimes as witnesses testified that Bean pawned property and purchased drugs with the proceeds. The drug use was proven by clear and convincing evidence: witnesses saw Bean ingest drugs, and a drug test conducted two days after his arrest indicated that there were still drugs in his system. While this evidence implicates Bean in uncharged illegal conduct, drug use is not so serious an offense that the prejudicial effect of discussing it outweighed its probative value. We therefore conclude that the district court did not abuse its discretion in admitting the evidence. *See Diomampo v. State*, 124 Nev. 414, 429-30, 185 P.3d 1031, 1041 (2008) (reviewing the district court's decision to admit prior bad act evidence for an abuse of discretion).

 

*Juvenile convictions*

Bean argues that the district court erred in admitting evidence of his juvenile convictions during the penalty phase of trial because juvenile adjudications do not require procedural safeguards equivalent to criminal convictions and therefore are not as reliable. We disagree.

Character evidence is admissible during a penalty hearing so long as it is not impalpable or highly suspect and the danger of unfair prejudice does not substantially outweigh its probative value. *Johnson*, 122 Nev. at 1354, 148 P.3d at 774; *see Nunnery*, 127 Nev. at 769, 263 P.3d at 249 (noting that relevant evidence may be excluded from penalty hearing if it is impalpable or highly suspect); *Hollaway v. State*, 116 Nev. 732, 746, 6 P.3d 987, 997 (2000), *overruled on other grounds by Lisle v. State*, 131 Nev., Adv. Op. 39, 351 P.3d 725 (2015); *see also* NRS 175.552(3). Here, Bean's juvenile record showed that shortly before he turned 18, he had committed burglary and possessed stolen property. This was relevant to the jury's sentencing decision as it evinced an escalation in Bean's criminal behavior and reflected on his amenability to rehabilitation. *Johnson*, 122 Nev. at 1354, 148 P.3d at 774. The prior adjudication is not rendered impalpable or highly suspect by the process employed in the juvenile system. None of the decisions Bean cites address the use of a juvenile adjudication during a capital penalty hearing. For these reasons, we conclude that the district court did not abuse its discretion in admitting this evidence. *See McConnell v. State*, 120 Nev. 1043, 1057, 102 P.3d 606, 616 (2004).

*Mitigating evidence*

Bean argues that the district court erred in limiting testimony from his gang expert on how members of a gang with which he was affiliated view his crimes. We disagree.

 

"Mitigation evidence includes 'any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.'" *Watson v. State*, 130 Nev. 764, 784, 335 P.3d 157, 171 (2014) (quoting *Lockett v. Ohio*, 438 U.S. 586, 604 (1978)). It may include "any aspect of the defendant's character, background, or record; any factor that extenuates or reduces the degree of the defendant's moral culpability . . . ; any circumstances of the offense; or any desire [a juror] may have to extend mercy to the defendant." *Id.* at 787 n.9, 335 P.3d at 174 n.9. Despite the broad scope of mitigating evidence, the evidence excluded here falls outside of that scope and was therefore irrelevant. *See* NRS 48.015 (defining relevant evidence as that which tends "to make the existence of any fact that is of consequence to the determination of the action more or less probable"). In particular, the potential actions of gang members who may find themselves incarcerated with Bean do not implicate aspects of Bean's character or record or the circumstances of the offense; instead, the evidence relates to the character of those with whom Bean may be incarcerated. Considering the nature of the proffered evidence, we conclude that the district court did not abuse its discretion in sustaining the State's objection. *See McConnell*, 120 Nev. at 1057, 102 P.3d at 616.

*Challenges to the death penalty*

Bean argues that the death penalty violates the Eighth Amendment's prohibition against cruel and unusual punishment and international law, is disproportionately imposed on minority defendants, is rife with erroneous dispositions, does not satisfy the goals of deterrence or rehabilitation, and has become less popular with the general public. We have rejected similar arguments, *see, e.g., Thomas v. State*, 122 Nev. 1361,

SUPREME COURT
OF
NEVADA

(O) 1947A

12

1373, 148 P.3d 727, 735-36 (2006) (reaffirming that Nevada's death penalty statutes sufficiently narrow the class of persons eligible for the death penalty); *Colwell v. State*, 112 Nev. 807, 814-15, 919 P.2d 403, 408 (1996) (rejecting claims that Nevada's death penalty scheme violates the United States or Nevada Constitutions); *Bishop v. State*, 95 Nev. 511, 517-18, 597 P.2d 273, 276-77 (1979) (similar); *see also Flanagan v. State*, 112 Nev. 1409, 1423, 930 P.2d 691, 700 (1996) (rejecting claims that extended confinement before execution was cruel and unusual punishment), and see no reason to do otherwise here. And Bean's challenge to the lethal injection protocol is not properly before us at this time. *See McConnell*, 120 Nev. at 1055, 102 P.3d at 615-16.

*Cumulative error*

Bean argues that the cumulative effect of the errors warrants reversal of the judgment of conviction. Because we have found no errors, there is nothing to cumulate. *Lipsitz v. State*, 135 Nev., Adv. Op. 17, 442 P.3d 138, 145 n.2 (2019).

*Mandatory review*

Under NRS 177.055(2), we are required to review every death sentence and consider "(c) Whether the evidence supports the finding of an aggravating circumstance or circumstances; (d) Whether the sentence of death was imposed under the influence of passion, prejudice or any arbitrary factor; and (e) Whether the sentence of death is excessive, considering both the crime and the defendant."

*Aggravating circumstances supported by the evidence*

We conclude that sufficient evidence supports the aggravating circumstances found as to each murder. The jury found three aggravating circumstances that applied to all five murders—(1) Bean had been convicted of more than one count of murder in the proceeding and that the murders

had been committed (2) during the commission of or flight from a burglary and (3) to receive money or another thing of monetary value. These aggravating circumstances are supported by the guilt phase evidence and verdicts. First, the jury found Bean guilty of five murders. Second, the State presented evidence that Bean entered the Pape residence and the Duff/Leiber residence with the intent to commit a felony and he killed Graham during his flight after burglarizing the Pape residence. And finally, the State presented evidence that Bean murdered all five victims to obtain something of monetary value—the jewelry, vehicle, and other property taken from the Pape residence; the vehicle that Graham was driving when he stopped to assist Bean; and the gun that Bean took from the Duff/Leiber residence.

The jury also found an additional felony aggravating circumstance as to the murders of Graham, Duff, and Leiber: that Graham was killed during the commission of a robbery and that Duff and Leiber were killed during Bean's flight after committing first-degree arson. The evidence presented during the guilt phase shows that Bean, who had gotten stuck while driving the truck he stole from the Papes, flagged down Graham (a passing motorist) and took Graham's vehicle from him by means of force or violence—shooting him in the head three times. Based on that evidence, a rational juror could find beyond a reasonable doubt that Bean murdered Graham during the commission of a robbery. As to Duff and Leiber, the evidence shows that Bean set fire to the Papes' home, fled to his friend Patrick's home where Patrick kicked him out, and then entered the Duff/Leiber residence, found a weapon, and murdered Duff and Leiber when they confronted him. Based on that evidence, a rational juror could find

beyond a reasonable doubt that Bean murdered Duff and Leiber during his flight from the arson.

The jury further found that Graham, Duff, and Leiber were murdered to "avoid or prevent a lawful arrest." NRS 200.033(5). An arrest need not be imminent nor must the victim be involved in effecting the arrest. *Evans v. State*, 112 Nev. 1172, 1196, 926 P.2d 265, 280 (1996); *Cavanaugh v. State*, 102 Nev. 478, 486, 729 P.2d 481, 486 (1986). The circumstance can apply when the suspect kills the victim because that victim could have identified him as the suspect in another crime. *See Blake v. State*, 121 Nev. 779, 794, 121 P.3d 567, 577 (2005). Here, the evidence showed that Bean had murdered the Papes and left Fernley in their truck. After getting stuck on the highway, he murdered Graham. Bean's possession of the Papes' truck linked him to their murder and made him more susceptible to arrest. By murdering Graham and taking his truck, he distanced himself from that evidence. As to Duff and Leiber's murder, Bean had returned to the Papes' home with Graham's truck and set the truck and home ablaze. He immediately returned to Patrick's home, but Patrick sent him away. He then entered Duff and Leiber's home in an apparent attempt to hide, but instead found a weapon and shot the victims when he was confronted. He attempted to hide on another property in the neighborhood while authorities responded to the blaze and was eventually arrested after reentering Duff and Leiber's garage. Based on this evidence, a rational juror could conclude that these murders occurred while trying to prevent a lawful arrest.

Finally, the jury found that Bean "knowingly created a great risk of death to more than one person," NRS 200.033(3), with regard to the murders of the Papes, Duff, and Leiber. The great-risk-of-death

SUPREME COURT
OF
NEVADA

(O) 1947A

15

aggravating circumstance "includes a 'course of action' consisting of two intentional shootings closely related in time and place, particularly where the second attack may have been motivated by a desire to escape detection in the original shooting." *Hogan v. State*, 103 Nev. 21, 24-25, 732 P.2d 422, 424 (1987). Applying the definition here, the evidence supports the aggravating circumstance with respect to the murders of Duff, Leiber, and the Papes. As to the Duff/Leiber murders, Bean found a .38 caliber gun in the home after entering through an unlocked door; shot Duff as she fled toward the kitchen; struggled with Leiber, eventually shooting him in the head; and then stabbed Duff to death with a knife she tried to use to defend herself. These two intentional shootings closely related in time and place are sufficient to support the jury's finding of the great-risk-of death aggravating circumstance with respect to the murders of Duff and Leiber. *See id.* at 24-25 & n.2, 732 P.2d at 424 & n.2 (concluding great-risk-of-death aggravating circumstance applied where defendant shot his girlfriend in the presence of her daughter and then shot her daughter while she was trying to flee). As to the Pape murders, Bean entered the home while Dorothy was inside sleeping and Robert was outside; locked the door to hinder Robert's entry; shot Dorothy in the head; positioned himself to catch Robert unaware when he entered; and then shot Robert in the head when he responded to the noise. Although the shootings are not as close in time as in the Duff/Leiber incident, this evidence shows a course of conduct involving two intentional shootings closely related in time and place, and the shooting of Robert appears to have been motivated by a desire to eliminate a possible witness to Dorothy's killing and facilitate his escape. The evidence is sufficient to support the jury's finding of the great-risk-of-death aggravating circumstance with respect to the Pape murders.



*Passion or prejudice*

As to the second question under this court's mandatory review, nothing in the record suggests the jury acted under the influence of passion, prejudice, or any other arbitrary factor. To the contrary, the record suggests a thoughtful and deliberative jury as evidenced by at least one juror finding a number of mitigating circumstances: (1) Bean's family loves him and would suffer if he is sentenced to death; (2) Bean has intelligence deficits; (3) Bean was cooperative with the investigation; (4) Bean has shown a peaceful adjustment to incarceration; and (5) drug abuse.

*Excessiveness*

With regard to the final question pursuant to NRS 177.055(2)(e), this court "consider[s] only the crime and the defendant at hand," and asks whether "the crime and defendant . . . [are] of the class or kind that warrants imposition of death." *Dennis v. State*, 116 Nev. 1075, 1084-85, 13 P.3d 434, 440 (2000). We conclude that the death penalty is not excessive in this case. Over the course of a single weekend, Bean murdered five strangers in three separate incidents, two of which involved residential burglaries. Bean had been convicted of another burglary a short time before he turned 18. Bean was 25 years old at the time of the murders. He engaged the crimes of his own initiative and was not assisted or influenced by anyone else. We acknowledge that experts agreed that Bean had some intellectual deficits and significant adaptive deficits and recognize that those deficits may have contributed to Bean's impulsive decision to embark on the course of conduct. But we conclude that those deficits are insufficient to render his death sentences for the five murders excessive.

Having rejected Bean's contentions and conducted the review required by NRS 177.055(2), we

ORDER the judgment of conviction AFFIRMED.

_____, C.J.
Gibbons

_____, J.
Pickering

_____, J.
Hardesty

_____, J.
Parraguirre

_____, J.
Stiglich

_____, J.
Cadish

_____, J.
Silver

cc:     Hon. John Schlegelmilch, District Judge
        Law Office of Thomas L. Qualls, Ltd.
        Attorney General/Carson City
        Lyon County District Attorney
        Third District Court Clerk